# UNITED STATES *v.* MONTOYA DE HERNANDEZ

No. 84–755.  Argued April 24, 1985—Decided July 1, 1985

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 545. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 545.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Trott*, and *John F. De Pue.*

*Peter M. Horstman*, by appointment of the Court, 469 U. S. 1204, argued the cause for respondent. With him on the brief was *Janet I. Levine.*

JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Rosa Elvira Montoya de Hernandez was detained by customs officials upon her arrival at the Los Angeles Airport on a flight from Bogota, Colombia. She was found to be smuggling 88 cocaine-filled balloons in her alimen-

tary canal, and was convicted after a bench trial of various federal narcotics offenses. A divided panel of the United States Court of Appeals for the Ninth Circuit reversed her convictions, holding that her detention violated the Fourth Amendment to the United States Constitution because the customs inspectors did not have a "clear indication" of alimentary canal smuggling at the time she was detained. 731 F. 2d 1369 (1984). Because of a conflict in the decisions of the Courts of Appeals on this question and the importance of its resolution to the enforcement of customs laws, we granted certiorari. 469 U. S. 1188. We now reverse.

Respondent arrived at Los Angeles International Airport shortly after midnight, March 5, 1983, on Avianca Flight 080, a direct 10-hour flight from Bogota, Colombia. Her visa was in order so she was passed through Immigration and proceeded to the customs desk. At the customs desk she encountered Customs Inspector Talamantes, who reviewed her documents and noticed from her passport that she had made at least eight recent trips to either Miami or Los Angeles. Talamantes referred respondent to a secondary customs desk for further questioning. At this desk Talamantes and another inspector asked respondent general questions concerning herself and the purpose of her trip. Respondent revealed that she spoke no English and had no family or friends in the United States. She explained in Spanish that she had come to the United States to purchase goods for her husband's store in Bogota. The customs inspectors recognized Bogota as a "source city" for narcotics. Respondent possessed $5,000 in cash, mostly $50 bills, but had no billfold. She indicated to the inspectors that she had no appointments with merchandise vendors, but planned to ride around Los Angeles in taxicabs visiting retail stores such as J. C. Penney and K-Mart in order to buy goods for her husband's store with the $5,000.

Respondent admitted that she had no hotel reservations, but stated that she planned to stay at a Holiday Inn. Respondent could not recall how her airline ticket was pur-

chased. When the inspectors opened respondent's one small valise they found about four changes of "cold weather" clothing. Respondent had no shoes other than the high-heeled pair she was wearing. Although respondent possessed no checks, waybills, credit cards, or letters of credit, she did produce a Colombian business card and a number of old receipts, waybills, and fabric swatches displayed in a photo album.

At this point Talamantes and the other inspector suspected that respondent was a "balloon swallower," one who attempts to smuggle narcotics into this country hidden in her alimentary canal. Over the years Inspector Talamantes had apprehended dozens of alimentary canal smugglers arriving on Avianca Flight 080. See App. 42; *United States* v. *Mendez-Jimenez*, 709 F. 2d 1300, 1301 (CA9 1983).

The inspectors requested a female customs inspector to take respondent to a private area and conduct a patdown and strip search. During the search the female inspector felt respondent's abdomen area and noticed a firm fullness, as if respondent were wearing a girdle. The search revealed no contraband, but the inspector noticed that respondent was wearing two pairs of elastic underpants with a paper towel lining the crotch area.

When respondent returned to the customs area and the female inspector reported her discoveries, the inspector in charge told respondent that he suspected she was smuggling drugs in her alimentary canal. Respondent agreed to the inspector's request that she be x-rayed at a hospital but in answer to the inspector's query stated that she was pregnant. She agreed to a pregnancy test before the x ray. Respondent withdrew the consent for an x ray when she learned that she would have to be handcuffed en route to the hospital. The inspector then gave respondent the option of returning to Colombia on the next available flight, agreeing to an x ray, or remaining in detention until she produced a monitored bowel movement that would confirm or rebut the inspectors'

suspicions. Respondent chose the first option and was placed in a customs office under observation. She was told that if she went to the toilet she would have to use a wastebasket in the women's restroom, in order that female customs inspectors could inspect her stool for balloons or capsules carrying narcotics. The inspectors refused respondent's request to place a telephone call.

Respondent sat in the customs office, under observation, for the remainder of the night. During the night customs officials attempted to place respondent on a Mexican airline that was flying to Bogota via Mexico City in the morning. The airline refused to transport respondent because she lacked a Mexican visa necessary to land in Mexico City. Respondent was not permitted to leave, and was informed that she would be detained until she agreed to an x ray or her bowels moved. She remained detained in the customs office under observation, for most of the time curled up in a chair leaning to one side. She refused all offers of food and drink, and refused to use the toilet facilities. The Court of Appeals noted that she exhibited symptoms of discomfort consistent with "heroic efforts to resist the usual calls of nature." 731 F. 2d, at 1371.

At the shift change at 4:00 o'clock the next afternoon, almost 16 hours after her flight had landed, respondent still had not defecated or urinated or partaken of food or drink. At that time customs officials sought a court order authorizing a pregnancy test, an x ray, and a rectal examination. The Federal Magistrate issued an order just before midnight that evening, which authorized a rectal examination and involuntary x ray, provided that the physician in charge considered respondent's claim of pregnancy. Respondent was taken to a hospital and given a pregnancy test, which later turned out to be negative. Before the results of the pregnancy test were known, a physician conducted a rectal examination and removed from respondent's rectum a balloon containing a foreign substance. Respondent was then placed

formally under arrest. By 4:10 a. m. respondent had passed 6 similar balloons; over the next four days she passed 88 balloons containing a total of 528 grams of 80% pure cocaine hydrochloride.

After a suppression hearing the District Court admitted the cocaine in evidence against respondent. She was convicted of possession of cocaine with intent to distribute, 21 U. S. C. § 841(a)(1), and unlawful importation of cocaine, 21 U. S. C. §§ 952(a), 960(a).

A divided panel of the United States Court of Appeals for the Ninth Circuit reversed respondent's convictions. The court noted that customs inspectors had a "justifiably high level of official skepticism" about respondent's good motives, but the inspectors decided to let nature take its course rather than seek an immediate magistrate's warrant for an x ray. 731 F. 2d, at 1372. Such a magistrate's warrant required a "clear indication" or "plain suggestion" that the traveler was an alimentary canal smuggler under previous decisions of the Court of Appeals. See *United States* v. *Quintero-Castro*, 705 F. 2d 1099 (CA9 1983); *United States* v. *Mendez-Jimenez*, 709 F. 2d 1300, 1302 (CA9 1983); but cf. *South Dakota* v. *Opperman*, 428 U. S. 364, 370, n. 5 (1976). The court applied this required level of suspicion to respondent's case. The court questioned the "humanity" of the inspectors' decision to hold respondent until her bowels moved, knowing that she would suffer "many hours of humiliating discomfort" if she chose not to submit to the x-ray examination. The court concluded that under a "clear indication" standard "the evidence available to the customs officers when they decided to hold [respondent] for continued observation was insufficient to support the 16-hour detention." 731 F. 2d, at 1373.

The Government contends that the customs inspectors reasonably suspected that respondent was an alimentary canal smuggler, and this suspicion was sufficient to justify the detention. In support of the judgment below respondent

argues, *inter alia*, that reasonable suspicion would not support respondent's detention, and in any event the inspectors did not reasonably suspect that respondent was carrying narcotics internally.

The Fourth Amendment commands that searches and seizures be reasonable. What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself. *New Jersey* v. *T. L. O.*, 469 U. S. 325, 337–342 (1985). The permissibility of a particular law enforcement practice is judged by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *United States* v. *Villamonte-Marquez*, 462 U. S. 579, 588 (1983); *Delaware* v. *Prouse*, 440 U. S. 648, 654 (1979); *Camara* v. *Municipal Court*, 387 U. S. 523 (1967).

Here the seizure of respondent took place at the international border. Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country. See *United States* v. *Ramsey*, 431 U. S. 606, 616–617 (1977), citing Act of July 31, 1789, ch. 5, 1 Stat. 29. This Court has long recognized Congress' power to police entrants at the border. See *Boyd* v. *United States*, 116 U. S. 616, 623 (1886). As we stated recently:

> "'Import restrictions and searches of persons or packages at the national border rest on different considerations and different rules of constitutional law from domestic regulations. The Constitution gives Congress broad comprehensive powers "[t]o regulate Commerce with foreign Nations," Art. I, §8, cl. 3. Historically such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from

entry.'"  *Ramsey, supra,* at 618–619, quoting *United States* v. *12 200-Ft. Reels of Film,* 413 U. S. 123, 125 (1973).

Consistently, therefore, with Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior.  Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant,[1] and first-class mail may be opened without a warrant on less than probable cause, *Ramsey, supra.*  Automotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion even if the stop is based largely on ethnicity, *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 562–563 (1976), and boats on inland waters with ready access to the sea may be hailed and boarded with no suspicion whatever.  *United States* v. *Villamonte-Marquez, supra.*

These cases reflect longstanding concern for the protection of the integrity of the border.  This concern is, if anything, heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics, see *United States* v. *Mendenhall,* 446 U. S. 544, 561 (1980) (POWELL, J., concurring), and in particular by the increasing utilization of alimentary canal smuggling.  This desperate practice appears to be a relatively recent addition to the smugglers' repertoire of deceptive practices, and it also appears to be exceedingly dif-

---

[1] See *United States* v. *Ramsey,* 431 U. S., at 616–619; *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 272–273 (1973); *id.,* at 288 (WHITE, J., dissenting).  As the Court stated in *Carroll* v. *United States,* 267 U. S. 132, 154 (1925):

"Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in and his belongings as effects which may be lawfully brought in."

ficult to detect.[2]   Congress had recognized these difficulties.
Title 19 U. S. C. § 1582 provides that "all persons coming into
the United States from foreign countries shall be liable to
detention and search authorized . . . [by customs regula-
tions]."   Customs agents may "stop, search, and examine"
any "vehicle, beast or person" upon which an officer suspects
there is contraband or "merchandise which is subject to
duty."   § 482; see also §§ 1467, 1481; 19 CFR §§ 162.6, 162.7
(1984).

Balanced against the sovereign's interests at the border
are the Fourth Amendment rights of respondent.   Having
presented herself at the border for admission, and having
subjected herself to the criminal enforcement powers of the
Federal Government, 19 U. S. C. § 482, respondent was enti-
tled to be free from unreasonable search and seizure.   But
not only is the expectation of privacy less at the border than
in the interior, see, *e. g., Carroll* v. *United States,* 267 U. S.

---

[2] See *United States* v. *DeMontoya,* 729 F. 2d 1369 (CA11 1984) (re-
quired surgery; swallowed 100 cocaine-filled condoms); *United States* v.
*Pino,* 729 F. 2d 1357 (CA11 1984) (required surgery; 120 cocaine-filled pel-
lets); *United States* v. *Mejia,* 720 F. 2d 1378 (CA5 1983) (75 balloons);
*United States* v. *Couch,* 688 F. 2d 599, 605 (CA9 1982) (36 capsules);
*United States* v. *Quintero-Castro,* 705 F. 2d 1099 (CA9 1983) (120 bal-
loons); *United States* v. *Saldarriaga-Marin,* 734 F. 2d 1425 (CA11 1984);
*United States* v. *Vega-Barvo,* 729 F. 2d 1341 (CA11 1984) (135 condoms);
*United States* v. *Mendez-Jimenez,* 709 F. 2d 1300 (CA9 1983) (102 bal-
loons); *United States* v. *Mosquera-Ramirez,* 729 F. 2d 1352 (CA11 1984)
(95 condoms); *United States* v. *Castrillon,* 716 F. 2d 1279 (CA9 1983) (83
balloons); *United States* v. *Castaneda-Castaneda,* 729 F. 2d 1360 (CA11
1984) (2 smugglers; 201 balloons); *United States* v. *Caicedo-Guarnizo,* 723
F. 2d 1420 (CA9 1984) (85 balloons); *United States* v. *Henao-Castano,* 729
F. 2d 1364 (CA11 1984) (85 condoms); *United States* v. *Ek,* 676 F. 2d 379
(CA9 1982) (30 capsules); *United States* v. *Padilla,* 729 F. 2d 1367 (CA11
1984) (115 condoms); *United States* v. *Gomez-Diaz,* 712 F. 2d 949 (CA5
1983) (69 balloons); *United States* v. *D'Allerman,* 712 F. 2d 100 (CA5 1983)
(80 balloons); *United States* v. *Contento-Pachon,* 723 F. 2d 691 (CA9 1984)
(129 balloons).

132, 154 (1925); cf. *Florida* v. *Royer*, 460 U. S. 491, 515 (1983) (BLACKMUN, J., dissenting), the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border. *Supra*, at 538.

We have not previously decided what level of suspicion would justify a seizure of an incoming traveler for purposes other than a routine border search. Cf. *Ramsey*, 431 U. S., at 618, n. 13. The Court of Appeals held that the initial detention of respondent was permissible only if the inspectors possessed a "clear indication" of alimentary canal smuggling. 731 F. 2d, at 1372, citing *United States* v. *Quintero-Castro*, 705 F. 2d 1099 (CA9 1983); cf. *United States* v. *Mendez-Jimenez*, 709 F. 2d 1300 (CA9 1983). This "clear indication" language comes from our opinion in *Schmerber* v. *California*, 384 U. S. 757 (1966), but we think that the Court of Appeals misapprehended the significance of that phrase in the context in which it was used in *Schmerber*.[3] The Court of Appeals viewed "clear indication" as an intermediate standard between "reasonable suspicion" and "probable cause." See *Mendez-Jimenez, supra*, at 1302. But we think that the words in *Schmerber* were used to indicate the necessity for particularized suspicion that the evidence sought might be found within the body of the individual, rather than as enunciating still a third Fourth Amendment threshold between "reasonable suspicion" and "probable cause."

No other court, including this one, has ever adopted *Schmerber*'s "clear indication" language as a Fourth Amendment standard. See, *e. g.*, *Winston* v. *Lee*, 470 U. S. 753,

---

[3] In that case we stated:

"The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusion [beyond the body's surface] on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search." 384 U. S., at 769–770.

759–763 (1985) (surgical removal of bullet for evidence). Indeed, another Court of Appeals, faced with facts almost identical to this case, has adopted a less strict standard based upon reasonable suspicion. See *United States* v. *Mosquera-Ramirez*, 729 F. 2d 1352, 1355 (CA11 1984). We do not think that the Fourth Amendment's emphasis upon reasonableness is consistent with the creation of a third verbal standard in addition to "reasonable suspicion" and "probable cause"; we are dealing with a constitutional requirement of reasonableness, not *mens rea*, see *United States* v. *Bailey*, 444 U. S. 394, 403–406 (1980), and subtle verbal gradations may obscure rather than elucidate the meaning of the provision in question.

We hold that the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal.[4]

The "reasonable suspicion" standard has been applied in a number of contexts and effects a needed balance between private and public interests when law enforcement officials must make a limited intrusion on less than probable cause. It thus fits well into the situations involving alimentary canal smuggling at the border: this type of smuggling gives no external signs and inspectors will rarely possess probable cause to arrest or search, yet governmental interests in stopping smuggling at the border are high indeed. Under this standard officials at the border must have a "particularized and objective basis for suspecting the particular person" of ali-

---

[4] It is also important to note what we do *not* hold. Because the issues are not presented today we suggest no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body-cavity, or involuntary x-ray searches. Both parties would have us decide the issue of whether aliens possess lesser Fourth Amendment rights at the border; that question was not raised in either court below and we do not consider it today.

mentary canal smuggling. *United States* v. *Cortez*, 449 U. S. 411, 417 (1981); *id.*, at 418, citing *Terry* v. *Ohio*, 392 U. S. 1, 21, n. 18 (1968).

The facts, and their rational inferences, known to customs inspectors in this case clearly supported a reasonable suspicion that respondent was an alimentary canal smuggler. We need not belabor the facts, including respondent's implausible story, that supported this suspicion, see *supra*, at 533–536. The trained customs inspectors had encountered many alimentary canal smugglers and certainly had more than an "inchoate and unparticularized suspicion or 'hunch,'" *Terry*, *supra*, at 27, that respondent was smuggling narcotics in her alimentary canal. The inspectors' suspicion was a "'common-sense conclusio[n] about human behavior' upon which 'practical people,'—including government officials, are entitled to rely." *T. L. O.*, 469 U. S., at 346, citing *United States* v. *Cortez*, *supra*.

The final issue in this case is whether the detention of respondent was reasonably related in scope to the circumstances which justified it initially. In this regard we have cautioned that courts should not indulge in "unrealistic second-guessing," *United States* v. *Sharpe*, 470 U. S. 675, 686 (1985), and we have noted that "creative judge[s], engaged in *post hoc* evaluations of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *Id.*, at 686–687. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, in itself, render the search unreasonable." *Id.*, at 687, citing *Cady* v. *Dombrowski*, 413 U. S. 433, 447 (1973). Authorities must be allowed "to graduate their response to the demands of any particular situation." *United States* v. *Place*, 462 U. S. 696, 709, n. 10 (1983). Here, respondent was detained incommunicado for almost 16 hours before inspectors sought a warrant; the warrant then took a number of hours to procure, through no apparent fault

of the inspectors. This length of time undoubtedly exceeds any other detention we have approved under reasonable suspicion. But we have also consistently rejected hard-and-fast time limits, *Sharpe, supra; Place, supra,* at 709, n. 10. Instead, "common sense and ordinary human experience must govern over rigid criteria." *Sharpe, supra,* at 685.

The rudimentary knowledge of the human body which judges possess in common with the rest of humankind tells us that alimentary canal smuggling cannot be detected in the amount of time in which other illegal activity may be investigated through brief *Terry*-type stops. It presents few, if any external signs; a quick frisk will not do, nor will even a strip search. In the case of respondent the inspectors had available, as an alternative to simply awaiting her bowel movement, an x ray. They offered her the alternative of submitting herself to that procedure. But when she refused that alternative, the customs inspectors were left with only two practical alternatives: detain her for such time as necessary to confirm their suspicions, a detention which would last much longer than the typical *Terry* stop, or turn her loose into the interior carrying the reasonably suspected contraband drugs.

The inspectors in this case followed this former procedure. They no doubt expected that respondent, having recently disembarked from a 10-hour direct flight with a full and stiff abdomen, would produce a bowel movement without extended delay. But her visible efforts to resist the call of nature, which the court below labeled "heroic," disappointed this expectation and in turn caused her humiliation and discomfort. Our prior cases have refused to charge police with delays in investigatory detention attributable to the suspect's evasive actions, see *Sharpe*, 470 U. S., at 687–688; *id.*, at 697 (MARSHALL, J., concurring in judgment), and that principle applies here as well. Respondent alone was responsible for much of the duration and discomfort of the seizure.

Under these circumstances, we conclude that the detention in this case was not unreasonably long. It occurred at the international border, where the Fourth Amendment balance of interests leans heavily to the Government. At the border, customs officials have more than merely an investigative law enforcement role. They are also charged, along with immigration officials, with protecting this Nation from entrants who may bring anything harmful into this country, whether that be communicable diseases, narcotics, or explosives. See 8 U. S. C. §§ 1182(a)(23), 1182(a)(6), 1222; 19 CFR §§ 162.4–162.7 (1984). See also 19 U. S. C. § 482; 8 U. S. C. § 1103(a). In this regard the detention of a suspected alimentary canal smuggler at the border is analogous to the detention of a suspected tuberculosis carrier at the border: both are detained until their bodily processes dispel the suspicion that they will introduce a harmful agent into this country. Cf. 8 U. S. C. § 1222; 42 CFR pt. 34 (1984); 19 U. S. C. §§ 482, 1582.

Respondent's detention was long, uncomfortable, indeed, humiliating; but both its length and its discomfort resulted solely from the method by which she chose to smuggle illicit drugs into this country. In *Adams* v. *Williams*, 407 U. S. 143 (1972), another *Terry*-stop case, we said that "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Id.*, at 145. Here, by analogy, in the presence of articulable suspicion of smuggling in her alimentary canal, the customs officers were not required by the Fourth Amendment to pass respondent and her 88 cocaine-filled balloons into the interior. Her detention for the period of time necessary to either verify or dispel the suspicion was not unreasonable. The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE STEVENS, concurring in the judgment.

If a seizure and a search of the person of the kind disclosed by this record may be made on the basis of reasonable suspicion, we must assume that a significant number of innocent persons will be required to undergo similar procedures. The rule announced in this case cannot, therefore, be supported on the ground that respondent's prolonged and humiliating detention "resulted solely from the method by which she chose to smuggle illicit drugs into this country." *Ante,* at 544.

The prolonged detention of respondent was, however, justified by a different choice that respondent made; she withdrew her consent to an x-ray examination that would have easily determined whether the reasonable suspicion that she was concealing contraband was justified. I believe that customs agents may require that a nonpregnant person reasonably suspected of this kind of smuggling submit to an x-ray examination as an incident to a border search. I therefore concur in the judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

We confront a "disgusting and saddening episode" at our Nation's border.[1] Shortly after midnight on March 5, 1983, the respondent Rosa Elvira Montoya de Hernandez was detained by customs officers because she fit the profile of an "alimentary canal smuggler."[2] This profile did not of course give the officers probable cause to believe that De Hernandez

---

[1] *United States* v. *Holtz,* 479 F. 2d 89, 94 (CA9 1973) (Ely, J., dissenting) (*re* "the disrobing and search of a woman by United States border police").

[2] Specifically, De Hernandez "had paid cash for her ticket, came from a source port of embarcation, carried $5,000 in U. S. currency, had made many trips of short duration into the United States, had no family or friends in the United States, had only one small piece of luggage, had no confirmed hotel reservations, did not speak English, and said she was planning to go shopping using taxis for transportation." 731 F. 2d 1369, 1371, n. 3 (CA9 1984).

was smuggling drugs into the country, but at most a "reasonable suspicion" that she might be engaged in such an attempt. After a thorough strip search failed to uncover any contraband, De Hernandez agreed to go to a local hospital for an abdominal x ray to resolve the matter. When the officers approached with handcuffs at the ready to lead her away, however, "she crossed her arms by her chest and began stepping backwards shaking her head negatively," protesting: "You are not going to put those on me. That is an insult to my character."[3]

Stymied in their efforts, the officers decided on an alternative course: they would simply lock De Hernandez away in an adjacent manifest room "until her peristaltic functions produced a monitored bowel movement."[4] The officers explained to De Hernandez that she could not leave until she had excreted by squatting over a wastebasket pursuant to the watchful eyes of two attending matrons. De Hernandez responded: "I will not submit to your degradation and I'd rather die."[5] She was locked away with the matrons.

De Hernandez remained locked up in the room for almost *24 hours*. Three shifts of matrons came and went during this time. The room had no bed or couch on which she could lie, but only hard chairs and a table. The matrons told her that if she wished to sleep she could lie down on the hard, uncarpeted floor. De Hernandez instead "sat in her chair clutching her purse," "occasionally putting her head down on the table to nap."[6] Most of the time she simply wept and pleaded "to go home."[7] She repeatedly begged for permission "to call my husband and tell him what you are doing to

---

[3] Declaration of Teodora A. Mendoza ¶ 6 (Mendoza Declaration), App. 58; Declaration of Jose Angel Serrato ¶ 10 (Serrato Declaration), App. 47.

[4] 731 F. 2d, at 1371. See also App. 18–20, 25, 28, 58.

[5] Serrato Declaration ¶ 17, App. 48.

[6] *Id.* ¶ 19, App. 48; Declaration of Marilee S. Morgan ¶ 3 (Morgan Declaration), App. 49.

[7] Declaration of Jerome Gonzales ¶ 20 (Gonzales Declaration), App. 55. See also *id.* ¶ 15, App. 54.

me."[8]   Permission was denied.   Sobbing, she insisted that she had to "make a phone call home so that she could talk to her children and to let them know that everything was all right."[9]   Permission again was denied.   In fact, the matrons considered it highly "unusual" that "each time someone entered the search room, she would take out two small pictures of her children and show them to the person."[10]   De Hernandez also demanded that her attorney be contacted.[11] Once again, permission was denied.   As far as the outside world knew, Rosa de Hernandez had simply vanished.   And although she already had been stripped and searched and probed, the customs officers decided about halfway through her ordeal to repeat that process—"to ensure the safety of the surveilling officers.   The result was again negative."[12]

After almost 24 hours had passed, someone finally had the presence of mind to consult a Magistrate and to obtain a court order for an x ray and a body-cavity search.[13]   De

---

[8] Serrato Declaration ¶ 12, App. 47.   See also Morgan Declaration ¶ 5, App. 49.

[9] Gonzales Declaration ¶ 21, App. 55.

[10] Morgan Declaration ¶ 4, App. 49.   See also Gonzales Declaration ¶ 15, App. 54.

[11] Serrato Declaration ¶ 14, App. 47.

[12] Stipulation Re Trial and Order Thereon, App. 64.

[13] A customs inspector had initially suggested that a court order for an x-ray examination be obtained, but his supervisor vetoed the idea on the grounds that (1) it was not Government policy to seek judicial authorization in such circumstances, id., at 22–23, and (2) "they did not have sufficient facts to support the issuance of the order," 731 F. 2d, at 1373.   The inspector called several hours later and reiterated his suggestion; again it was denied.   Ibid.   Not until 16 hours had elapsed did the supervisor begin to consider obtaining a court order.   App. 23.   Another eight hours passed before the supervisor got around to contacting a Federal Magistrate, who after putting the supervisor under oath and listening to the available evidence promptly issued a telephonic order to proceed with the x-ray examination.   Declaration of Kyle E. Windes ¶ 11, App. 40.   See also id., at 44–45; n. 27, infra.

The Magistrate's order was based largely on the observations by customs officials of De Hernandez' behavior during her detention.   See App. 42.   As the Ninth Circuit concluded, because the unlawful detention

Hernandez, "very agitated," was handcuffed and led away to the hospital.[14] A rectal examination disclosed the presence of a cocaine-filled balloon. At approximately 3:15 on the morning of March 6, *almost 27 hours after her initial detention*, De Hernandez was formally placed under arrest and advised of her *Miranda* rights. Over the course of the next four days she excreted a total of 88 balloons.

"[T]hat the [respondent] so degraded herself as to offend the sensibilities of any decent citizen is not questioned."[15] That is not the issue we face. For "[i]t is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." *United States* v. *Rabinowitz*, 339 U. S. 56, 69 (1950) (Frankfurter, J., dissenting). The standards we fashion to govern the ferreting out of the guilty apply equally to the detention of the innocent, and "may be exercised by the most unfit and ruthless officers as well as by the fit and responsible." *Brinegar* v. *United States*, 338 U. S. 160, 182 (1949) (Jackson, J., dissenting).[16] Nor is the issue whether there is a "veritable

produced the "additional evidence" that was used to obtain the order, the contraband discovered in implementing the order was tainted and therefore improperly introduced at De Hernandez' trial. 731 F. 2d, at 1372.

[14] Morgan Declaration ¶ 9, App. 50.

[15] *United States* v. *Holtz*, 479 F. 2d, at 94 (Ely, J., dissenting).

[16] Justice Jackson also noted in *Brinegar*:

"We must remember that the extent of any privilege of search and seizure without warrant which we sustain, the officers interpret and apply themselves and will push to the limit. We must remember, too, that freedom from unreasonable search differs from some of the other rights of the Constitution in that there is no way in which the innocent citizen can invoke advance protection. For example, any effective interference with freedom of the press, or free speech, or religion, usually requires a course of suppressions against which the citizen can and often does go to the court and obtain an injunction. Other rights, such as that to an impartial jury or the aid of counsel, are within the supervisory power of the courts themselves. Such a right as just compensation for the taking of private property may be vindicated after the act in terms of money.

"But an illegal search and seizure usually is a single incident, perpetrated by surprise, conducted in haste, kept purposely beyond the court's

national crisis in law enforcement caused by smuggling of illicit narcotics." *Ante*, at 538. There is, and "[s]tern enforcement of the criminal law is the hallmark of a healthy and self-confident society." *Davis* v. *United States*, 328 U. S. 582, 615 (1946) (Frankfurter, J., dissenting). "But in our democracy such enforcement presupposes a moral atmosphere and a reliance upon intelligence whereby the effective administration of justice can be achieved with due regard for those civilized standards in the use of the criminal law which are formulated in our Bill of Rights." *Ibid.*

The issue, instead, is simply this: Does the Fourth Amendment permit an international traveler, citizen or alien, to be subjected to the sort of treatment that occurred in this case without the sanction of a judicial officer and based on nothing more than the "reasonable suspicion" of low-ranking investigative officers that something might be amiss? The Court today concludes that the Fourth Amendment grants such sweeping and unmonitored authority to customs officials. It reasons that "[t]he permissibility of a particular law enforcement practice is judged by 'balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Ante*, at 537. The Court goes on to assert that the "balance of reasonableness is qualitatively different at the international border," and that searches and seizures in these circumstances may therefore be conducted without probable cause or a warrant. *Ante*, at 538. Thus a traveler at the Nation's border may be detained for criminal investigation merely if the authorities "reasonably suspect that the traveler is smuggling contraband." *Ante*, at 541. There are no "hard-and-fast time limits" for

---

supervision and limited only by the judgment and moderation of officers whose own interests and records are often at stake in the search. There is no opportunity for injunction or appeal to disinterested intervention. The citizen's choice is quietly to submit to whatever the officers undertake or to resist at risk of arrest or immediate violence." 338 U. S., at 182 (dissenting opinion).

such investigative detentions, because "'common sense and ordinary human experience must govern over rigid criteria.'" *Ante*, at 543. Applying this "reasonableness" test to the instant case, the Court concludes that the "[r]espondent alone was responsible for much of the duration and discomfort of the seizure." *Ibid.*

JUSTICE STEVENS takes a somewhat different tack. Apparently convinced that the health effects of x-irradiation on human beings stand established as so minimal as to be little cause for concern, he believes that low-ranking customs officials on their own initiative may require nonpregnant international travelers to submit to warrantless x rays on nothing more than suspicion if such travelers wish to avoid indeterminate warrantless detentions. Because De Hernandez withdrew her consent to proceed in handcuffs to such an examination, "[t]he prolonged detention of respondent was . . . justified." *Ante*, at 545 (concurring in judgment).

I dissent. Indefinite involuntary incommunicado detentions "for investigation" are the hallmark of a police state, not a free society. See, *e. g.*, *Dunaway* v. *New York*, 442 U. S. 200 (1979); *Brown* v. *Illinois*, 422 U. S. 590 (1975); *Davis* v. *Mississippi*, 394 U. S. 721 (1969). In my opinion, Government officials may no more confine a person at the border under such circumstances for purposes of criminal investigation than they may within the interior of the country. The nature and duration of the detention here may well have been tolerable for spoiled meat or diseased animals, but not for human beings held on simple suspicion of criminal activity. I believe such indefinite detentions can be "reasonable" under the Fourth Amendment only with the approval of a magistrate. I also believe that such approval can be given only upon a showing of probable cause. Finally, I believe that the warrant and probable-cause safeguards equally govern JUSTICE STEVENS' proffered alternative of exposure to x-irradiation for criminal-investigative purposes.

## I

Travelers at the national border are routinely subjected to questioning, patdowns, and thorough searches of their belongings. These measures, which involve relatively limited invasions of privacy and which typically are conducted on all incoming travelers, do not violate the Fourth Amendment given the interests of "national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." *Carroll* v. *United States*, 267 U. S. 132, 154 (1925).[17] Individual travelers also may be singled out on "reasonable suspicion" and briefly held for further investigation. Cf. *Terry* v. *Ohio*, 392 U. S. 1 (1968).[18] At some point, however, further investigation involves such severe intrusions on the values the Fourth Amendment protects that more stringent safeguards are required. For example, the length and nature of a detention may, at least when conducted for criminal-investigative purposes, ripen into something approximating a full-scale custodial arrest — indeed, the arrestee, unlike the detainee in cases such as this, is at least given such basic rights as a telephone call, *Miranda* warnings, a bed, a prompt hearing before the nearest federal magistrate, an appointed attorney, and consideration of bail. In addition, border detentions may involve the use of such highly intrusive investigative techniques as body-cavity searches, x-ray searches, and stomach pumping.[19]

---

[17] See generally 3 W. LaFave, Search and Seizure § 10.5, pp. 276–281 (1978) (LaFave).

[18] See generally *id.* § 10.5, at 281–286.

[19] See generally *id.* § 10.5, at 286–295; Note, From Bags to Body Cavities: The Law of Border Search, 74 Colum. L. Rev. 53 (1974); Comment, Intrusive Border Searches — Is Judicial Control Desirable?, 115 U. Pa. L. Rev. 276 (1966); Note, Border Searches and the Fourth Amendment, 77 Yale L. J. 1007 (1968).

I believe that detentions and searches falling into these more intrusive categories are presumptively "reasonable" within the meaning of the Fourth Amendment only if authorized by a judicial officer. "Though the Fourth Amendment speaks broadly of 'unreasonable searches and seizures,' the definition of 'reasonableness' turns, at least in part, on the more specific commands of the warrant clause." *United States* v. *United States District Court*, 407 U. S. 297, 315 (1972).

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Johnson* v. *United States*, 333 U. S. 10, 13–14 (1948).

Accordingly, the Court repeatedly has emphasized that the Fourth Amendment's Warrant Clause is not mere "dead language" or a bothersome "inconvenience to be somehow 'weighed' against the claims of police efficiency. It is, or should be, an important working part of our machinery of government, operating as a matter of course to check the 'well-intentioned but mistakenly overzealous executive officers' who are a part of any system of law enforcement." *United States* v. *United States District Court, supra,* at 315; *Coolidge* v. *New Hampshire*, 403 U. S. 443, 473–484 (1971).[20]

---

[20] See *Katz* v. *United States*, 389 U. S. 347, 354 (1967); *Berger* v. *New York*, 388 U. S. 41, 57, 60 (1967); *Beck* v. *Ohio*, 379 U. S. 89, 96–97 (1964); *Wong Sun* v. *United States*, 371 U. S. 471, 481–482 (1963); *Agnello* v.

We have, to be sure, held that executive officials need not obtain prior judicial authorization where exigent circumstances would make such authorization impractical and counterproductive. In so holding, however, we have reaffirmed the general rule that "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." *Terry* v. *Ohio, supra,* at 20. And even where a person has permissibly been taken into custody without a warrant, we have held that a prompt probable-cause determination by a detached magistrate is a constitutional "prerequisite to extended restraint of liberty following arrest." *Gerstein* v. *Pugh,* 420 U. S. 103, 114 (1975).[21] Cf. *Mallory* v. *United States,* 354 U. S. 449, 451–452 (1957); *McNabb* v. *United States,* 318 U. S. 332, 342 (1943); 18 U. S. C. § 3501(c); Fed. Rule Crim. Proc. 5.

---

*United States,* 269 U. S. 20, 33 (1925). See also *New Jersey* v. *T. L. O.,* 469 U. S. 325, 357 (1985) (BRENNAN, J., dissenting) (emphasis in original):

"To require a showing of some extraordinary governmental interest before dispensing with the warrant requirement is not to undervalue society's need to apprehend violators of the criminal law. To be sure, forcing law enforcement personnel to obtain a warrant before engaging in a search will predictably deter the police from conducting some searches that they would otherwise like to conduct. But this is not an unintended *result* of the Fourth Amendment's protection of privacy; rather, it is the very *purpose* for which the Amendment was thought necessary. Only where the governmental interests at stake exceed those implicated in any ordinary law enforcement context—that is, only where there is some extraordinary governmental interest involved—is it legitimate to engage in a balancing test to determine whether a warrant is indeed necessary."

[21] "Once the suspect is in custody, . . . the reasons that justify dispensing with the magistrate's neutral judgment evaporate. There no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to a magistrate. And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly. The consequences of prolonged detention may be more serious than the interference occasioned by arrest. . . . When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish

There is no persuasive reason not to apply these principles to lengthy and intrusive criminal-investigative detentions occurring at the Nation's border. To be sure, the Court today invokes precedent stating that neither probable cause nor a warrant ever have been required for border searches. See *ante*, at 537, citing *United States* v. *Ramsey*, 431 U. S. 606 (1977). If this is the law as a general matter, I believe it is time that we reexamine its foundations.[22] For while the power of Congress to authorize wide-ranging detentions and searches *for purposes of immigration and customs control* is unquestioned, the Court previously has emphasized that far different considerations apply when detentions and searches are carried out *for purposes of investigating suspected criminal activity*. See *Wong Wing* v. *United States*, 163 U. S. 228, 231, 235–236, 238 (1896); see also *Abel* v. *United States*, 362 U. S. 217, 250 (1960) (BRENNAN, J., dissenting). And even if the Court is correct that such detentions for purposes of criminal investigation were viewed as acceptable a century or two ago, see *ante*, at 537, we repeatedly have stressed that "this Court has not simply frozen into constitutional law those law enforcement practices that existed at the time of the Fourth Amendment's passage." *Payton* v. *New York*, 445 U. S. 573, 591, n. 33 (1980); see also *Tennessee* v. *Garner*, 471 U. S. 1, 13 (1985).

The Government contends, however, that because investigative detentions of the sort that occurred in this case need not be supported by probable cause, no warrant is required, given the phraseology of the Fourth Amendment's Warrant

---

meaningful protection from unfounded interference with liberty." *Gerstein* v. *Pugh*, 420 U. S., at 114.

[22] Others agree. See, *e. g.*, 3 LaFave § 10.5, at 325 (*Ramsey* offered only "a flimsy and not particularly satisfying explanation" for refusing to apply the warrant requirement); Note, 74 Colum. L. Rev., *supra* n. 19, at 82–86; Comment, 115 U. Pa. L. Rev., *supra* n. 19, at 277. See also *United States* v. *Holtz*, 479 F. 2d, at 94 (Ely, J., dissenting); *Blefare* v. *United States*, 362 F. 2d 870, 880 (CA9 1966) (Ely, J., dissenting).

Clause. See Brief for United States 29, n. 26.[23] Even assuming that border detentions and searches that become lengthy and highly intrusive need not be supported by probable cause, but see Part II, *infra*, this reasoning runs squarely contrary to the Court's administrative-warrant cases. We have repeatedly held that the Fourth Amendment's purpose of safeguarding "the privacy and security of individuals against arbitrary invasions by government officials" is so fundamental as to require, except in "certain carefully defined classes of cases," a magistrate's prior authorization even where "[p]robable cause in the criminal law sense is not required." *Camara* v. *Municipal Court*, 387 U. S. 523, 528 (1967); *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 312, 320 (1978). We have applied this requirement to fire, health, and housing-code inspections, *Camara* v. *Municipal Court, supra; See* v. *Seattle*, 387 U. S. 541 (1967), to occupational health and safety inspections of the workplace, *Marshall* v. *Barlow's, Inc., supra*, and to arson investigations, *Michigan* v. *Clifford*, 464 U. S. 287 (1984) (plurality opinion); *Michigan* v. *Tyler*, 436 U. S. 499 (1978). See also *Almeida-Sanchez* v. *United States*, 413 U. S. 266, 279–285 (1973) (POWELL, J., concurring) (prior judicial authorization is required for area-wide roving searches near the border); *United States* v. *United States District Court*, 407 U. S., at 322–324 (prior judicial authorization of national-security wiretaps).

Something has gone fundamentally awry in our constitutional jurisprudence when a neutral and detached magistrate's authorization is required before the authorities may inspect "the plumbing, heating, ventilation, gas, and electri-

---

[23] The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

cal systems" in a person's home,[24] investigate the back rooms of his workplace, or poke through the charred remains of his gutted garage, but *not* before they may hold him in indefinite involuntary isolation at the Nation's border to investigate whether he might be engaged in criminal wrongdoing. No less than those who conduct administrative searches, those charged with investigative duties at the border "should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks," because "unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy." *Id.*, at 317. And unlike administrative searches, which typically involve "relatively limited invasion[s]" of individual privacy interests, *Camara* v. *Municipal Court, supra,* at 537, many border searches carry grave potential for "arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals," *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 554 (1976); see also *United States* v. *Ortiz,* 422 U. S. 891, 895 (1975); *Almeida-Sanchez* v. *United States, supra,* at 273–275. The conditions of De Hernandez' detention in this case—indefinite confinement in a squalid back room cut off from the outside world, the absence of basic amenities that would have been provided to even the vilest of hardened criminals, repeated strip searches—in many ways surpassed the conditions of a full custodial arrest. Although the Court previously has declined to require a warrant for border searches involving "minor interference with privacy resulting from the mere stop for questioning," *United States* v. *Martinez-Fuerte, supra,* at 565, surely there is no parallel between such "minor" intrusions and the extreme invasion of personal privacy and dignity that occurs in detentions and searches such as that before us today.

---

[24] LaFave, Administrative Searches and the Fourth Amendment: The Camara and See Cases, 1967 S. Ct. Rev. 1, 19.

Moreover, the available evidence suggests that the number of highly intrusive border searches of suspicious-looking but ultimately innocent travelers may be very high. One physician who at the request of customs officials conducted many "internal searches"—rectal and vaginal examinations and stomach pumping—estimated that he had found contraband in only 15 to 20 percent of the persons he had examined.[25] It has similarly been estimated that only 16 percent of women subjected to body-cavity searches at the border were in fact found to be carrying contraband.[26] It is precisely to minimize the risk of harassing so many innocent people that the Fourth Amendment requires the intervention of a judicial officer. See, *e. g.*, *Coolidge* v. *New Hampshire*, 403 U. S., at 481. And even if the warrant safeguard were somehow a mere inconvenient nuisance to be "'weighed' against the claims of police efficiency," *ibid.*, the Government points to no unusual efficiency concerns suggesting that this safeguard should be overridden in the run of such intrusive border-search cases. Certainly there were no "exigent circumstances" supporting the indefinite warrantless detention here, and the Government's interest in proceeding expeditiously could have been achieved by obtaining a telephonic

---

[25] *Thompson* v. *United States*, 411 F. 2d 946, 948 (CA9 1969); see also *Morales* v. *United States*, 406 F. 2d 1298, 1300, n. 2 (CA9 1969).

[26] *United States* v. *Holtz*, 479 F. 2d, at 94 (Ely, J., dissenting) (citing testimony from congressional hearings). It was suggested at oral argument that "with all the experience the government has had in the intervening years with increasing drug traffic" there might be "a little more skill in detection today." Tr. of Oral Arg. 38. There are, however, no published statistics more recent than the information discussed in text. It is of course the Government's burden to muster facts demonstrating the reasonableness of its investigative practices. See, *e. g.*, *Florida* v. *Royer*, 460 U. S. 491, 500 (1983) (plurality opinion). The Government advised the Court at argument that it has more recent statistical evidence respecting the number of innocent travelers who are subjected to x-ray searches, but did not disclose that evidence because "it's not in the record and it's not public." Tr. of Oral Arg. 23.

search warrant — a procedure "ideally suited to the peculiar needs of the customs authorities" and one that ultimately was used in this case a full day after De Hernandez was first detained.[27]

The Court supports its evasion of the warrant requirement, however, by analogizing to the *Terry* line of cases authorizing brief detentions based on reasonable suspicion. It argues that no "hard-and-fast time limits" can apply in this context because "alimentary canal smuggling cannot be detected in the amount of time in which other illegal activity may be investigated through brief *Terry*-type stops." *Ante*, at 543. I have previously set forth my views on the proper scope and duration of *Terry* stops,[28] and need not repeat those views in detail today. It is enough for present purposes to note that today's opinion is the most extraordinary example to date of the Court's studied effort to employ the *Terry* decision as a means of converting the Fourth Amendment into a general "reasonableness" balancing process — a process "in which the judicial thumb apparently will be planted firmly on the law enforcement side of the scales." *United States* v. *Sharpe*, 470 U. S. 675, 720 (1985) (BRENNAN, J., dissenting). We previously have emphasized that *Terry* allows the authorities *briefly* to detain an individual for investigation and questioning, but that "any *further detention* or search must be based on consent or probable cause." *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 882 (1975) (emphasis

---

[27]Note, 74 Colum. L. Rev., *supra* n. 19, at 85; see n. 13, *supra*. The Government argues, however, that "[a] warrant requirement would be especially inappropriate in this context because the suspect would have to be detained while the officer obtained the warrant . . . ." Brief for United States 29–30, n. 26. Coming from the Government in a case in which it is seeking to defend a *27-hour* detention, this expression of purported concern for travelers' rights is simply incredible.

[28]See, *e. g.*, *United States* v. *Sharpe*, 470 U. S. 675, 702 (1985) (dissenting); *United States* v. *Place*, 462 U. S. 696, 710 (1983) (concurring in result); *Kolender* v. *Lawson*, 461 U. S. 352, 362 (1983) (concurring); *Florida* v. *Royer*, *supra*, at 509 (concurring in result).

added).   Allowing such warrantless detentions under *Terry* suggests that the authorities might hold a person on suspicion for "however long it takes" to get him to cooperate, or to transport him to the station where the "legitimate" state interests more fully can be pursued, or simply to lock him away while deciding what the State's "legitimate" interests require.   But the Fourth Amendment flatly prohibits such "wholesale intrusions upon the personal security", of individuals, and any application of *Terry* even by analogy to permit such indefinite detentions "would threaten to swallow" the basic probable-cause and warrant safeguards.   *Dunaway* v. *New York*, 442 U. S., at 213; see *Davis* v. *Mississippi*, 394 U. S., at 726.[29]   It is simply staggering that the Court suggests that *Terry* would even begin to sanction a *27-hour criminal-investigative detention*, even one occurring at the border.

The Court argues, however, that the length and "discomfort" of De Hernandez' detention "resulted *solely* from the method by which she chose to smuggle illicit drugs into this country," and it speculates that only her "'heroic'" efforts prevented the detention from being brief and to the point. *Ante*, at 544 (emphasis added).   Although we now know that De Hernandez was indeed guilty of smuggling drugs internally, such *post hoc* rationalizations have no place in our Fourth Amendment jurisprudence, which demands that we "prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure."   *United States* v. *Martinez-Fuerte*, 428 U. S., at 565.   See also *Beck* v. *Ohio*, 379 U. S. 89, 96 (1964).   At the time the authorities simply had, at most, a reasonable suspicion that De Hernandez

---

[29] See also *Florida* v. *Royer, supra,* at 499, 505–506 (plurality opinion); *Brown* v. *Illinois,* 422 U. S. 590, 605 (1975) ("The impropriety of the arrest was obvious . . . .   The arrest, both in design and in execution, was investigatory.   The detectives embarked upon this expedition for evidence in the hope that something might turn up.   The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion").

might be engaged in such smuggling. Neither the law of the land nor the law of nature supports the notion that petty government officials can require people to excrete on command; indeed, the Court relies elsewhere on "[t]he rudimentary knowledge of the human body" in sanctioning the "much longer than . . . typical" duration of detentions such as this. *Ante*, at 543. And, with all respect to the Court, it is not "'unrealistic second-guessing,'" *ante*, at 542, to predict that an innocent traveler, locked away in incommunicado detention in unfamiliar surroundings in a foreign land, might well be so frightened and exhausted as to be unable so to "cooperate" with the authorities.[30]

The Court further appears to believe that such investigative practices are "reasonable," however, on the premise that a traveler's "expectation of privacy [is] less at the border than in the interior." *Ante*, at 539. This may well be so with respect to routine border inspections, but I do not imagine that decent and law-abiding international travelers have yet reached the point where they "expect" to be thrown into locked rooms and ordered to excrete into wastebaskets, held incommunicado until they cooperate, or led away in handcuffs to the nearest hospital for exposure to various medical procedures—all on nothing more than the "reasonable" suspicions of low-ranking enforcement agents. In fact, many people from around the world travel to our borders precisely to escape such unchecked executive investigatory discretion. What a curious first lesson in American liberty awaits them

---

[30] As De Hernandez' counsel observed at argument: "What if an innocent traveler just because they have had a long flight was unable to excrete and found themselves in a position where a border agent said well, we wish you to excrete [on] command so that we will be sure that you're not carrying anything internally. An innocent person might be unable to do that on command, and it wouldn't be heroic efforts in that case. . . . It's certainly possible that a person who is nervous or afraid anyway because they are being confined would be unable to excrete for a lengthy period of time, but that wouldn't necessarily mean evidence of guilt." Tr. of Oral Arg. 28–29.

on their arrival. Cf. *Olmstead* v. *United States*, 277 U. S. 438, 485 (1928) (Brandeis, J., dissenting).[31]

Finally, I disagree with JUSTICE STEVENS that De Hernandez' alternative "choice" of submitting to abdominal x-irradiation at the discretion of customs officials made this detention "justified." *Ante*, at 545 (concurring in judgment). Medical x rays are of course a common diagnostic technique; that is exactly why there is such a sharp debate among the medical community concerning the cellular and chromosomal effects of routine reliance on x rays, both from the perspective of individual health (it having been estimated that a routine medical x ray takes about six days off a person's life expectancy[32]) and from the perspective of successive generations. The "additivity" factor—the cumulative effect of x rays on an individual's biological and genetic well-being—has been the subject of particularly disturbing debate.[33]

---

[31] As I have written in the analogous context of searches of children conducted by school authorities:

"We do not know what class petitioner was attending when the police and dogs burst in, but the lesson the school authorities taught her that day will undoubtedly make a greater impression than the one her teacher had hoped to convey. I would grant certiorari to teach petitioner another lesson: that the Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' . . . . Schools cannot expect their students to learn the lessons of good citizenship when the school authorities themselves disregard the fundamental principles underpinning our constitutional freedoms." *Doe* v. *Renfrow*, 451 U. S. 1022, 1027–1028 (1981) (dissenting from denial of certiorari). See also *New Jersey* v. *T. L. O.*, 469 U. S., at 354 (BRENNAN, J., dissenting); *id.*, at 373–374 (STEVENS, J., dissenting). Cf. 8 U. S. C. § 1423(2) (as a condition of naturalization, a person must have "a knowledge and understanding of the fundamentals of the history, and of the principles and form of government, of the United States").

[32] Gregg, Effects of Ionizing Radiations on Humans, in 2 Handbook of Medical Physics 404 (R. Waggener ed. 1982).

[33] See generally *id.*, at 375–411; H. Cember, Introduction to Health Physics 177–199 (2d ed. 1983); U. S. Department of Health and Human Services, Food and Drug Administration, Public Health Service, Possible Genetic Damage from Diagnostic X Irradiation: A Review (1980).

But these dangers are not the gravamen of my dispute with JUSTICE STEVENS; the Court has concluded that medical practices far more immediately intrusive than this may in carefully limited circumstances be employed as a tool of criminal investigation. Cf. *Winston* v. *Lee*, 470 U. S. 753 (1985). Rather, the crux of my disagreement is this: We have learned in our lifetimes, time and again, the inherent dangers that result from coupling unchecked "law enforcement" discretion with the tools of medical technology. Accordingly, in this country at least, "[t]he importance of informed, detached and deliberate [judicial] determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great." *Schmerber* v. *California*, 384 U. S. 757, 770 (1966). Because "[s]earch warrants are ordinarily required for searches of dwellings, . . . *absent an emergency*, no less could be required where intrusions into the human body are concerned." *Ibid.* (emphasis added). This should be so whether the intrusion is by incision, by stomach pumping, or by exposure to x-irradiation. Because no exigent circumstances prevented the authorities from seeking a magistrate's authorization so to probe De Hernandez' abdominal cavity, the proffered alternative "choice" of a warrantless x ray was just as impermissible as the 27-hour detention that actually occurred.

## II

I believe that De Hernandez' detention violated the Fourth Amendment for an additional reason: it was not supported by probable cause. In the domestic context, a detention of the sort that occurred here would be permissible only if there were probable cause at the outset. See, *e. g.*, *Hayes* v. *Florida*, 470 U. S. 811, 815 (1985); *Dunaway* v. *New York*, 442 U. S., at 207–208, 212–216; *Brown* v. *Illinois*, 422 U. S., at 602, 605; *Davis* v. *Mississippi*, 394 U. S., at 726–727. This

same elementary safeguard should govern border searches *when carried out for purposes of criminal investigation.*

To be sure, it is commonly asserted that as a result of the Fourth Amendment's "border exception" there is no requirement of probable cause for such investigations.[34] But the justifications for the border exception necessarily limit its breadth. The exception derives from the unquestioned and paramount interest in "national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." *Carroll* v. *United States,* 267 U. S., at 154. See also *Almeida-Sanchez* v. *United States,* 413 U. S., at 272 (border exception is a reasonable condition for those "seeking to cross our borders"); *United States* v. *12 200-Ft. Reels of Film,* 413 U. S. 123, 125 (1973) (border exception is a reasonable condition "to prevent prohibited articles from entry"). Subject only to the other applicable guarantees of the Bill of Rights, this interest in "national self-protection" is plenary. Thus, as the Court notes, a suspected tuberculosis carrier may be detained at the border for medical testing and treatment as a condition of entry. *Ante,* at 544. As a condition of entry, the traveler may be subjected to exhaustive processing and examinations, and his belongings may be scrutinized with exacting care.[35] I have no doubt as well that, *as a condition of entry,* travelers in appropriate circumstances may be required to excrete their bodily wastes for further scrutiny and to submit to diagnostic x rays.

Contrary to the Court's reasoning, however, the Government in carrying out such immigration and customs functions does not simply have the two stark alternatives of either forc-

---

[34] See, *e. g., United States* v. *Ramsey,* 431 U. S. 606, 616, 619 (1977); 3 LaFave § 10.5, at 276–295.

[35] See generally 8 U. S. C. § 1181 *et seq.;* 19 U. S. C. § 232 *et seq.,* § 1701 *et seq.*

ing a traveler to submit to such procedures or allowing him to "pass . . . into the interior." *Ante,* at 544. There is a third alternative: to instruct the traveler who refuses to submit to burdensome but reasonable conditions of entry that he is free to turn around and leave the country. In fact, I believe that the "reasonableness" of any burdensome requirement for entry is necessarily conditioned on the potential entrant's freedom to leave the country if he objects to that requirement. Surely the Government's manifest interest in preventing potentially excludable individuals carrying potential contraband from crossing our borders is fully vindicated if those individuals voluntarily decided not to cross the borders.

This does not, of course, mean that such individuals are not fully subject to the criminal laws while on American soil. If there is probable cause to believe they have violated the law, they may be arrested just like any other person within our borders. And if there is "reasonable suspicion" to believe they may be engaged in such violations, they may briefly be detained pursuant to *Terry* for further investigation, subject to the same limitations and conditions governing *Terry* stops anywhere else in the country.[36] But if such *Terry* suspicion does not promptly ripen into probable cause, such travelers must be given a meaningful choice: either agree to further detention as a condition of eventual entry, or leave the country.

The Government disagrees. We were advised at oral argument that it "definitely" is the policy of customs authorities "not to allow such people, if they're reasonably suspected of drug smuggling, to return before that suspicion can be checked out" and that, whether citizen, resident alien, or alien, "[w]e would not simply let them go back." Tr. of Oral Arg. 5, 48. The result is to sanction an authoritarian twilight zone on the border. The suspicious-looking traveler may not enter the country. Nor may he leave. Instead, he

---

[36] See, *e. g., United States* v. *Place,* 462 U. S., at 707–710; *Florida* v. *Royer,* 460 U. S., at 499–500 (plurality opinion); *Dunaway* v. *New York,* 442 U. S. 200, 210–216 (1979).

is trapped on the border.   Because he is on American soil, he is fully subject "to the criminal enforcement powers of the Federal Government." *Ante*, at 539, citing 19 U. S. C. § 482.   But notwithstanding that he is on American soil, he is *not* fully protected by the guarantees of the Bill of Rights applicable everywhere else in the country.   To be sure, a watered-down "reasonableness" requirement will technically govern such detentions, but it will accommodate itself to assaults on privacy and personal autonomy that would not for one moment pass constitutional muster anywhere else in the country and that would surely provide grounds for an open-and-shut damages action for violations of basic civil rights if conducted anywhere but on the border.

Nothing in the underlying premises of the "border exception" supports such a ring of unbridled authoritarianism surrounding freedom's soil.   If the traveler does not wish to consent to prolonged detentions or intrusive examinations, the Nation's customs and immigration interests are fully served by sending the traveler on his way elsewhere.   If the authorities nevertheless propose to detain the traveler for purposes of subjecting him to criminal investigation and possible arrest and punishment, they may do so only pursuant to constitutional safeguards applicable to everyone else in the country.   See *Wong Wing* v. *United States*, 163 U. S., at 236–238; *Abel* v. *United States*, 362 U. S., at 250 (BRENNAN, J., dissenting).[37]   Chief among those safeguards is the re-

---

[37] Although the Government now disavows those actions, see Tr. of Oral Arg. 5, 48, the customs authorities apparently sought to arrange to have De Hernandez flown either to Mexico or back to Colombia, but concluded that she would not be able to secure a flight for at least two days.   See App. 18, 22, 28, 32; Serrato Declaration ¶ 17, App. 48; Gonzales Declaration ¶ 20, App. 55; Mendoza Declaration ¶¶ 8–10, App. 58.   Even if the Government had not repudiated these efforts, it is clear that, as the District Court found, De Hernandez was subjected to exacting surveillance during this time for purposes of criminal investigation and possible arrest.   *Id.*, at 37. See also Serrato Declaration ¶ 18, App. 48 ("I told her also that if while she is in our custody, if she discharges anything illegally internally, she will be

quirement that, except in limited circumstances not present here, custodial detentions occur only on probable cause. The probable-cause standard rests on "a practical, nontechnical conception affording the best compromise that has been found for accommodating" the "often opposing" interests of law enforcement and individual liberty. *Brinegar* v. *United States*, 338 U. S., at 176 (Jackson, J., dissenting). See also *New Jersey* v. *T. L. O.*, 469 U. S. 325, 361–362 (1985) (BRENNAN, J., dissenting). That standard obviously is not met, and was not met here, simply by courier profiles, "common rumor or report, suspicion, or even 'strong reason to suspect.'" *Henry* v. *United States*, 361 U. S. 98, 101 (1959). Because the contraband in this case was the fruit of the authorities' indefinite detention of Rosa de Hernandez without probable cause or a warrant, I would affirm the judgment of the Court of Appeals for the Ninth Circuit reversing her conviction.

## III

In my opinion, allowing the Government to hold someone in indefinite, involuntary, incommunicado isolation without

---

placed under arrest and transported to a jail ward and be unable to leave the United States").

The Government argues that giving a traveler the option of leaving the country rather than being forced to undergo lengthy custodial criminal investigations based on mere suspicion "is an unsatisfactory alternative because it would allow the suspect to escape apprehension and return to repeat his smuggling efforts another day. In addition, this approach would remove a disincentive to smuggling activity by materially reducing the risk of apprehension and prosecution." Brief for United States 17–18, n. 9. This is exactly the same argument made whenever courts enforce the safeguards of the Fourth Amendment, and we have consistently stressed that if constitutionally permissible investigative stops do not promptly uncover sufficient evidence to support an arrest, the detainee must be released as a necessary consequence of constitutional liberty. See, *e. g.*, *United States* v. *Place, supra,* at 709–710; *Florida* v. *Royer, supra,* at 499 (plurality opinion) ("the police [may not] seek to verify their suspicions by means that approach the conditions of arrest"); *Dunaway* v. *New York, supra,* at 211–216; *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 881–882 (1975).

probable cause and a judicial warrant violates our constitutional charter whether the purpose is to extract ransom or to investigate suspected criminal activity. Nothing in the Fourth Amendment permits an exception for such actions at the Nation's border. It is tempting, of course, to look the other way in a case that so graphically illustrates the "veritable national crisis" caused by narcotics trafficking. *Ante,* at 538. But if there is one enduring lesson in the long struggle to balance individual rights against society's need to defend itself against lawlessness, it is that "[i]t is easy to make light of insistence on scrupulous regard for the safeguards of civil liberties when invoked on behalf of the unworthy. It is too easy. History bears testimony that by such disregard are the rights of liberty extinguished, heedlessly at first, then stealthily, and brazenly in the end." *Davis* v. *United States,* 328 U. S., at 597 (Frankfurter, J., dissenting).

I dissent.