UNITED STATES of America, Plaintiff,
v.
Oluwatoyin Oluyominu
OSHINUGA, Defendant.

No. 86 CR 641.

United States District Court,
N.D. Illinois, E.D.

Nov. 10, 1986.

Anton R. Valukas, U.S. Atty. by Daniel C. Murray, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Maurice Scott, Jr., Chicago, Ill., for defendant.

## MEMORANDUM ORDER

BUA, District Judge.

This matter comes before this Court on defendant's motion to suppress evidence pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure. For the reasons stated herein, defendant's motion is denied.

## I. FACTS

The defendant, a female citizen of Nigeria, arrived at O'Hare International Airport at 2:30 p.m. on August 28, 1986 after departing a nine-hour nonstop flight from Switzerland. Customs officials at O'Hare conducting routine search of defendant's belongings noticed she was traveling only with one small duffle bag which contained a few changes of clothing including a pair of soiled panties and a tube of topical steroid gel. Defendant was escorted to a search room where female Customs officers conducted a pat-down search. The Customs officers noticed defendant, a woman of normal weight, was wearing a girdle underneath her rather baggy clothing.

The officers asked defendant her occupation and purpose of visit, and defendant responded that she came to Chicago to purchase items for resale at her shop in Nigeria. Defendant's passport revealed she had traveled to Chicago previously on July 12 and August 2, 1986. An examination of her airline ticket indicated it had been purchased two days earlier in Nigeria for cash in an amount equivalent to $800 U.S. currency and no return flight had been scheduled.

In a subsequent continuation search, defendant was asked to remove her garments and the officer observed a clear glossy substance that appeared to be unnatural in the vaginal area. After redressing, defendant was again questioned about her occupation. Defendant told the officers she shops at stores on Michigan Avenue but had no appointments. She carried $1,200 in $100 bills but told the officers $2,000 in cash was taken from her purse in Switzerland. Defendant indicated, however, she had filed no report with Swiss authorities concerning the stolen money. When asked about the Chicago address she listed on her Customs declaration, defendant told Customs personnel her sister lived there and that defendant had visited her sister at that address twice before. A subsequent investigation revealed the address defendant had given did not exist.

Defendant was told she was suspected of being a drug courier. Approximately at 5:00 p.m., an Assistant U.S. Attorney was contacted and steps were initiated to obtain a search warrant for X-rays as well as rectal and vaginal examinations. At about 9:20 a.m. on Friday, August 29, 1986, a search warrant issued authorizing "abdominal, rectal and vaginal X-rays; and rectal and vaginal examinations to locate and remove foreign articles, objects or substances." Defendant was informed a search warrant had issued and was transported to a nearby hospital to conduct the X-rays and examinations.

At the hospital, defendant initially refused to submit to an X-ray but told Customs officers she was willing to remove any items in her abdominal area herself. Medical personnel at the hospital advised defendant, however, an X-ray should be taken to be sure the objects were not lodged at inaccessible angles. Defendant again refused to allow an X-ray.

At approximately 3:30 p.m., defendant was given *Miranda* warnings and provided officers with a statement indicating she had "something" in her body and she would provide additional information when the objects were removed. Based on the content of this statement, a supplemental search warrant issued. Defendant was informed that if she would not submit herself willingly to the X-ray and examination, she

would be sedated in order to execute the warrants. At approximately 6:45 p.m. defendant signed Customs hospital consent forms. X-rays revealed spherical objects were lodged in defendant's vaginal and rectal areas. The objects were subsequently removed and found to contain over 340 grams of heroin. Defendant was placed under arrest and again read her *Miranda* rights. Subsequently, the defendant gave incriminating statements to Customs and Drug Enforcement Administration officials.

## II. DISCUSSION

Defendant's motion asks this Court to suppress all physical evidence and all written and oral statements procured from her prior to her arrest. Defendant argues Customs officials had insufficient evidence immediately following her detention to hold her with the knowledge she could not be compelled to submit to an X-ray until the following day. Defendant asserts that prior to the issuance of the initial search warrant, she had a right to leave the United States but was denied that right when Customs officers premised her release on the condition she first submit to an X-ray examination. Thus, defendant contends her prearrest detention was unlawful and any resulting evidence should be suppressed.

### A. *United States v. Montoya de Hernandez*

Recently, the Supreme Court announced standards governing border detentions in a case with facts strikingly similar to the one at bar. *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). In *Montoya de Hernandez*, a Columbian national was detained by Customs officials in Los Angeles after departing a direct flight from Columbia. *Id.* at 3306. The defendant's passport indicated she had made several recent trips to Los Angeles and Miami. *Id.* at 3307. When questioned about the purpose of her trip, the defendant told Customs personnel she had come to purchase items for resale for her husband's store in Columbia. *Id.*

Although the defendant possessed $5,000 in $50 bills, she told Customs officials she had no appointments with any merchandise vendors or any hotel reservations. *Id.*

Customs officials escorted the defendant to a private area and conducted a pat-down and strip search. *Id.* Female Customs officers observed that the defendant was wearing two pairs of elastic support underwear with a paper towel lining in the crotch area. *Id.* After the search, defendant informed Customs officers she was pregnant. *Id.* The defendant, however, refused to submit to an X-ray to verify her pregnancy. *Id.* The defendant was then given the option of returning to Columbia, agreeing to an X-ray, or remaining in detention until she produced a monitored stool that would confirm or rebut the officers' suspicions. *Id.* Although defendant related her desire to return to Columbia on the next available flight, no such travel arrangements were secured by Customs officers before a search warrant for a pregnancy test, X-ray and rectal examination issued. *Id.* Approximately 24 hours after her initial detention, the search warrant was executed and 88 balloons containing cocaine were extracted from defendant's alimentary canal. *Id.* Subsequently, defendant motioned to suppress the physical evidence and inculpatory statements on the ground Customs officers had no "clear indication" she was smuggling narcotics in her alimentary canal when they initially detained her.

Noting the detention in question occurred at an international border, the Court reiterated that the Fourth Amendment's balance of reasonableness affords greater latitude to Customs officials enforcing narcotics laws at the nation's borders than in situations involving searches and seizures in the country's interior. *Id.* at 3309. Recognizing the nation's longstanding concern for protecting the integrity of its borders and the extreme difficulty faced by law enforcement officials in detecting alimentary canal smuggling, the Court rejected a standard requiring authorities to have a "clear indication" of smuggling activity before instituting a border stop. *Id.* at

3308. Instead, the Court adopted a less rigorous two-part test for examining the constitutionality of border detentions beyond the scope of a routine Customs search and inspection.

Under the test, government officials must have a reasonable suspicion an individual is attempting to smuggle narcotics in an internal cavity. In other words, government authorities must possess some "particularized and objective basis for suspecting the particular person of alimentary canal smuggling" ... "from all the facts surrounding the person and his trip." *Id.* at 3311. Second, the detention of the individual must be "reasonably related in scope to the circumstances which justified it initially." *Id.* In analyzing this aspect of the test, lower courts were cautioned against engaging in creative *post hoc* evaluations of police conduct to find some alternative less restrictive means for reaching investigative objectives. *Id.* In this regard, the Court emphasized that "the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not by itself, render the search unreasonable." *Id.*

Applying the facts to the first leg of the two-part test, the Court determined the circumstances surrounding the defendant, her stated purpose of travel, her meager belongings, and her unusual undergarments supported a reasonable suspicion she was an alimentary canal smuggler. *Id.* at 3311. According to the Court, the Customs officers' suspicion was "a common-sense conclusion about human behavior upon which practical people—including government officials, are entitled to rely." *Id.*

Turning to the second step of the two-part analysis, the Court noted the defendant's 16–hour *incommunicado* detention prior to the seeking of a search warrant was longer than any period previously approved under reasonable suspicion. *Id.* However, the Court emphasized that alimentary canal smuggling was not detectable in the same amount of time in which other types of unlawful activity could be uncovered during the course of a brief *Ter-*ry-type stop. *Id.* at 3312. The Court found that in cases like the one before it where the defendants' chosen method of smuggling and subsequent attempts to avoid detection were responsible for long periods of prearrest detention, Fourth Amendment principles were not offended. *Id.* Ruling that the time the defendant was detained was necessary to either verify or dispel the reasonably held suspicion she was an alimentary canal smuggler, the Court held her 16–hour prewarrant detention was reasonable and upheld the dismissal of her motion to suppress. *Id.*

### B. *Defendant's Motion to Suppress*

■ An evidentiary hearing on a motion to suppress need only be held if the moving party shows that disputed issues of material fact exist which must be resolved before reaching the merits of the party's assertions. *Nechy v. United States*, 665 F.2d 775, 776 (7th Cir.1981). For purposes of this motion, the government concedes the following facts asserted by the defendant are not at issue: (1) after being detained, defendant requested to leave the United States on the next available flight but was denied such permission; (2) defendant was continuously questioned and urged to sign a consent form to have an X-ray performed; (3) defendant was detained for 18 hours before a search warrant was issued; (4) defendant was not permitted to use the telephone prior to being placed under arrest. Thus, this Court turns to the merits of defendant's motion to suppress.

■ The defendant raises two basic arguments in her motion to suppress. First, defendant argues that immediately subsequent to her detention, Customs officers had insufficient evidence to form a reasonable suspicion she was smuggling narcotics internally and thus hold her under the stipulation she submit to an X-ray. Second, the defendant asserts she had a right to leave the United States prior to the issuance of the search warrant and was denied that right when Customs officers refused to release her without submitting to an X-ray. These arguments will be addressed in turn.

Relating the circumstances in this case to the facts in *Montoya de Hernandez,* this Court is compelled to reach the similar conclusion that Customs officials had a sufficient basis to entertain a reasonable suspicion the defendant was smuggling narcotics. The numerous recent trips from a recognized source country, the implausible nature of the defendant's stated purpose of travel, the unusual undergarments, and the unnatural substance observed during the strip search provided more than an adequate basis for the Customs officers to reasonably suspect unlawful activity.

 Similarly, the fact the defendant was held without a search warrant for an 18–hour period does not render the detention *per se* unreasonable. As in *Montoya de Hernandez,* the unusually long period of detention was warranted in light of the elusive manner of smuggling attempted by the defendant and her lack of cooperation in dispelling the suspicions reasonably held by Customs officers. Moreover, unlike *Montoya de Hernandez,* where the defendant was held 16 hours before a search warrant was sought, Customs authorities in this case initiated the application procedure just hours after the defendant's detention began. As the Supreme Court observed in *Montoya de Hernandez,* a law enforcement official who lacks the precise level of evidence requisite for probable cause is not bound to "simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Montoya de Hernandez,* 105 S.Ct. at 3312. Here, the period of detention endured by defendant was necessary to confirm or dismiss the reasonable suspicion she was transporting narcotics internally. Thus, whether Customs officers knew an X-ray could not have been taken until the following day when defendant was initially detained is irrelevant since the defendant's prewarrant detention under the circumstances was not unreasonably long.

 The second argument advanced by defendant assumes a foreign national being detained at a border on the reasonable belief she is smuggling narcotics has a constitutional right to leave the United States on her own accord prior to the issuance of a search warrant. Defendant cites no authority for this proposition nor does this Court's research reveal any cases supporting such a right. To the contrary, *Montoya de Hernandez* suggests the failure to accommodate a detainee's request to return to her native land has no effect on the legality of a prewarrant detention. *Montoya de Hernandez,* at 3307–11. Customs officers in the present case were not required to allow the defendant flee the United States after forming a reasonable suspicion she was attempting to smuggle narcotics in her bodily cavities. Thus, defendant's second argument provides no basis for granting the motion to suppress.

 Finally, although defendant does not specifically argue that her detention was unlawful because she was not given access to a telephone before her arrest, this Court notes that *Montoya de Hernandez* did not attach any significance to a similar contention. In *Montoya de Hernandez,* the defendant asserted that she continuously pleaded with Customs officials for permission to call her husband, family and attorney. *Montoya de Hernandez,* 105 S.Ct. at 3314 (Brennan, J., dissenting). Yet, over a strong dissent, the Court did not find this fact dictated a finding of unreasonableness. *Id.* at 3311–13. Accordingly, the fact defendant was not permitted to use the telephone prior to her arrest did not render her detention unreasonable.

## III. CONCLUSION

For the reasons stated herein, defendant's motion to suppress is denied without hearing.

IT IS SO ORDERED.