[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 23, 2000
THOMAS K. KAHN
CLERK

_____

No. 99-12361

_____

D. C. Docket No. 98-00569-CR-UUB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DARREN DEMEATRIE GORDON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(October 23, 2000)**

Before EDMONDSON and MARCUS, Circuit Judges, and RESTANI[*], Judge.

MARCUS, Circuit Judge:

---

[*]Honorable Jane A. Restani, Judge, U.S. Court of International Trade, sitting by designation.

A jury convicted Defendant Darren Gordon of robbery and firearms offenses in connection with a brutal attack on a gun store clerk. On appeal, Gordon raises two sets of issues. First, he challenges the district court's denial of his motion to suppress evidence seized by the police after an investigatory stop on the night of the robbery. Gordon contends that the police lacked the reasonable suspicion required for an investigatory stop, because the only basis for that stop was his presence in a reputed high-crime area and his alleged flight after sighting the officers. Second, Gordon contends that the district court improperly relied upon his co-Defendants' hearsay statements to support a role enhancement and an upward departure at sentencing. Because we find no reversible error in the district court's rulings, we affirm Gordon's conviction and sentence.

I.

On July 29, 1998, a federal grand jury indicted Gordon and three co-Defendants, Carlton Grant, Sule Jackson, and Enos Beauchamp, for their role in a violent robbery at a gun store in Hialeah, Florida. Gordon had initially been arrested by Miami-Dade County police officers for violating Florida's anti-loitering statute (Fla. Stat. § 856.021); evidence seized from Gordon's car at the time of that arrest gave rise to the robbery-related charges. The indictment charged each of the Defendants with robbing the gun store in violation of 18 U.S.C. § 1951,

2

carrying and using firearms during the robbery in violation of 18 U.S.C. § 924(c)(1), and possessing firearms as a felon in violation of 18 U.S.C. § 922(g)(1). Grant, Jackson, and Beauchamp all pled guilty; Gordon alone proceeded to trial.

Evidence at trial established the following events. Kathleen Maltbie was a sales clerk at the Kodiak Military Surplus and Firearms Store in Hialeah. She testified that she was tending the store alone when, at approximately 5:00 p.m. on May 6, 1998, she heard the buzzer sound indicating that someone had entered the store. When she walked to the front of the store, expecting to greet a customer, a man grabbed her from behind in a chokehold and placed a gun to her head, while a second man attempted to grab her by the legs. A third man behind the counter asked Maltbie how to open the cash register, while a fourth person moved near a rifle rack. Maltbie testified that her assailant tried "to choke the daylights out of me." She then lost consciousness when the first man, leaning her body over a counter of merchandise, "smashed" her in the face with a pistol. She was found later in the back of the store where she lay bound, gagged, and wearing handcuffs. Maltbie was subsequently hospitalized with numerous injuries from this violent attack, including a fractured eye socket, a crushed nose, broken teeth, and multiple bruises and lacerations on her scalp, wrists and ankles. Maltbie also suffered severe and ongoing psychological trauma from the assault.

About three hours after the robbery, Gordon, two co-Defendants, and a fourth man were arrested in a nearby area for loitering and prowling in violation of Florida law.[1] The arresting officers searched the car in which the Defendants were traveling, and recovered four fully-loaded .9 millimeter magazine clips in the back seat, as well as a flak jacket, several boxes of bullets, a black gun case, and a ski mask found in the trunk. Hialeah police subsequently identified the property seized from the car as property taken in the Kodiak store robbery. Maltbie thereafter identified Jackson as one of the individuals involved in the robbery, and recognized Gordon and Grant as individuals who visited the store prior to the robbery.

On May 11, 1998, police went to Gordon's home and arrested him for possession of stolen property. After having been read his rights and signing a waiver form, Gordon proceeded to discuss the circumstances of the robbery. Gordon acknowledged that he had driven Jackson, Beauchamp, and Grant to the gun store on the day of the robbery. He maintained, however, that it was Grant, not he, who had beaten Maltbie, and that he only entered the store after the beating had occurred. As discussed below, Gordon's co-Defendants, in post-arrest

---

[1]The facts surrounding this arrest are set forth below in the discussion of Gordon's motion to suppress. See Part IV, infra.

4

statements of their own, gave a completely different version of events that put Gordon at the center of the vicious assault and the robbery.

Before trial Gordon moved to suppress the physical evidence seized after his arrest as well as his post-arrest confession. He argued that the police lacked reasonable suspicion to stop him when he was observed on the night of the robbery, and also lacked probable cause to arrest him for loitering and prowling. The magistrate judge, after conducting a hearing, entered proposed findings of fact and recommended that Gordon's motion be denied. The magistrate judge concluded that there was a sufficient basis for the stop as well as the arrest. The district court, after considering Gordon's objections, adopted the magistrate judge's report and denied the motion. A jury eventually convicted Gordon on all three counts against him.

The district court, in sentencing Gordon, increased his base offense level by two under § 3B1.1(c) of the Sentencing Guidelines because he was the leader or organizer of the offense. The court also departed upward one level under USSG §§ 5K2.3 and 5K2.8 based upon the nature and extent of the injury inflicted on the victim of the robbery. In making these enhancements, the district court implicitly relied in part on taped and transcribed post-arrest statements by Gordon's three co-Defendants. The court ultimately sentenced Gordon to 300 months in prison.

## II.

There is no dispute about the proper standards of review. A district court's findings of fact in resolving a motion to suppress are reviewed for clear error; the court's application of the law to those facts is reviewed de novo. See United States v. Gonzales, 71 F.3d 819, 824 (11th Cir. 1996). We construe the facts in the light most favorable to the prevailing party (here, the government). See id.; United States v. Briggman, 931 F.2d 705, 708 (11th Cir. 1991) (per curiam). A district court's upward adjustment of a defendant's Guidelines offense level due to his status as a leader or organizer under USSG § 3B1.1 is reviewed only for clear error. See United States v. De Varon, 175 F.3d 930, 937 & n.3 (11th Cir.) (en banc) ("This Court has long and repeatedly held that a district court's determination of a defendant's role in the offense is a finding of fact to be reviewed only for clear error."), cert. denied, -- U.S. --, 120 S. Ct. 424, 145 L. Ed. 2d 331 (1999). A court's upward departure from the Guidelines is reviewed only for abuse of discretion. See United States v. Taylor, 88 F.3d 938, 945 (11th Cir. 1996).

## III.

Gordon's first ground for appeal concerns the district court's denial of his motion to suppress.  Gordon argues that the police lacked reasonable suspicion to stop him initially, and also lacked probable cause to arrest him for violating Florida's anti-loitering statute.  We disagree.

A.

The Fourth Amendment prohibits "unreasonable searches and seizures . . .." U.S. Const. Amend. IV.  "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself."  United States v. Montoya de Hernandez, 473 U.S. 531, 537, 105 S. Ct. 3304, 3308, 87 L. Ed. 2d 381 (1985). The general rule is that "warrantless searches are presumptively unreasonable . . .."  Horton v. California, 496 U.S. 128, 133, 110 S. Ct. 2301, 2306, 110 L. Ed. 2d 112 (1990).  The courts have, however, fashioned exceptions to the general rule, recognizing that in certain limited situations the government's interest in conducting a search without a warrant may outweigh the individual's privacy interest.  See, e.g., id.; Montoya de Hernandez, 473 U.S. at 537-41, 105 S. Ct. at 3308-11.

A so-called "Terry stop" is one such narrow exception.  See Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  Terry, and the cases which have followed it, make clear that "an officer may, consistent with the Fourth

7

Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 120 S. Ct. 673, 675, 145 L. Ed. 2d 570 (2000). To make a showing that he in fact had reasonable suspicion, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'" Id. (quoting Terry, 392 U.S. at 27, 88 S. Ct. at 1868). Thus, "'[w]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.'" Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting Wardlow, 120 S. Ct. at 675-76). A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity. See Wardlow, 120 S. Ct. at 677; Terry, 392 U.S. at 22-23, 88 S. Ct. at 1868.

The circumstances surrounding the initial stop of Gordon are as follows.[2] At approximately 8:00 p.m. on the night of the robbery, Miami-Dade Police Detective Juan Leon and a partner were conducting a routine patrol in a marked police car in the area of 15th Avenue and 61st Street in Miami. As they turned a corner,

---

[2]This summary is based on the factual findings of the district court and the magistrate judge. Gordon does not squarely challenge those findings, although he does dispute some inferences that may be drawn from them.

8

Detective Leon observed Defendant and three other black males standing approximately ten feet behind a light colored "Ford type" vehicle. As the men observed the detectives approach, their "eyes lit up"; Detective Leon said that they resembled deer staring into an automobile's headlights. According to Leon, the men then "ran back" toward and entered the car, and "took off" with Defendant driving. The magistrate judge described the men as having "walked quickly" back to the car; the district court found that they "ran or at least walked very quickly" to the car.

Although there were stores and homes in the surrounding blocks, the only buildings near where the men were standing were a few mostly (although not entirely) abandoned apartment buildings. According to Detective Leon, the area was known for drug sales and drive-by shootings. Detective Leon stated succinctly, "the average citizen doesn't hang in that place."

Believing that the men were violating Florida's anti-loitering statute, Detective Leon called for backup to help stop Defendants' vehicle. Once the vehicle was stopped, Detective Leon ordered the men out. Detective Leon could see several loaded magazine clips in plain view in the back seat of the car. When he asked the Defendants what they were doing and whether they lived in the area, the men denied living in the area and gave inconsistent answers regarding their

9

reasons for being there; Gordon, for example, said that he was taking one of the passengers home, an assertion no passenger confirmed.  Based on these circumstances, Detective Leon read the men their rights and gave them another opportunity to dispel his suspicion.  When they failed to do so, they were placed under arrest for loitering and prowling.  It was after the arrest that Detective Leon, in accordance with department policy, searched the interior and exterior of the vehicle and seized the loaded magazine clips and other items eventually traced to the Kodiak store.

The Supreme Court's recent opinion in Wardlow guides how the law applies to these facts.  In Wardlow, the Court reversed the Illinois Supreme Court's decision to suppress evidence seized from a defendant after a Terry stop made in circumstances similar to those in the case at bar.  There, the officers were driving the last car of a four car caravan converging on a Chicago neighborhood known for heavy narcotics trafficking in order to investigate drug transactions. The officers were traveling together because they expected to find a crowd of people in the area, including lookouts and customers.  As the caravan passed one building, an officer noticed the defendant standing next to the building holding an opaque bag.  The defendant looked in the direction of the officers and then fled down an alley.  The officers eventually cornered the defendant on the street.  An officer immediately

conducted a protective pat-down search for weapons, relying on his experience that

weapons were often found in the near vicinity of narcotics transactions.  During the

frisk, the officer squeezed the bag respondent was carrying and felt a heavy, hard

object similar to the shape of a gun.  The officer then opened the bag and

discovered a .38-caliber handgun with five live rounds of ammunition. The officers

arrested the defendant, who subsequently was convicted for unlawful use of a

weapon by a felon.

The defendant moved to suppress the gun, arguing that the officer did not

have reasonable suspicion sufficient to justify a Terry stop.  The Illinois Supreme

Court agreed, finding that even though the defendant was present in a high crime

area, sudden flight in such an area does not create a reasonable suspicion of

unlawful activity.  The Supreme Court rejected that logic:

> An individual's presence in an area of expected criminal
> activity, standing alone, is not enough to support a reasonable,
> particularized suspicion that the person is committing a crime.  But
> officers are not required to ignore the relevant characteristics of a
> location in determining whether the circumstances are sufficiently
> suspicious to warrant further investigation.  Accordingly, we have
> previously noted the fact that the stop occurred in a "high crime area"
> among the relevant contextual considerations in a Terry analysis.

> In this case, moreover, it was not merely respondent's presence
> in an area of heavy narcotics trafficking that aroused the officers'
> suspicion but his unprovoked flight upon noticing the police. Our
> cases have also recognized that nervous, evasive behavior is a
> pertinent factor in determining reasonable suspicion.  Headlong flight

11

-- wherever it occurs -- is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. We conclude [the officer] was justified in suspecting that [defendant] was involved in criminal activity, and, therefore, in investigating further. . . .

[U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning. Respondent and amici also argue that there are innocent reasons for flight from police and that, therefore, flight is not necessarily indicative of ongoing criminal activity. This fact is undoubtedly true, but does not establish a violation of the Fourth Amendment. Even in Terry, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. . . . Terry recognized that the officers could detain the individuals to resolve the ambiguity.

120 S. Ct. at 676-77 (internal citations omitted).

Guided by the Supreme Court's analysis in Wardlow, we conclude that there was reasonable suspicion sufficient to justify stopping Gordon. Gordon and his co-Defendants were sighted standing, at night, within ten feet of a parked car, surrounded by largely abandoned buildings, in an area notorious for violent crime and drug trafficking. Standing alone, these facts would not have justified this stop.

12

But there is a critical additional fact in this case: the Defendant's flight. It is the powerful evidence of flight that drives the district court's findings and dictates the outcome of this appeal.

The district court specifically found that Gordon's eyes "lit up" and he moved quickly toward the Defendants' car when the first marked police vehicle approached. There may be perfectly innocent reasons in certain circumstances for someone to walk or even run away from a location upon the approach of a law enforcement officer. But Gordon's conduct in this case -- making eye contact with the officer, thereafter moving quickly toward an adjacent car, entering that car, and then driving away in the opposite direction from the officers -- <u>coupled</u> with the officers' knowledge of frequent unlawful activity in the neighborhood where Gordon had been standing, provided adequate grounds for this <u>Terry</u> stop.

Gordon acknowledged at oral argument that the facts of <u>Wardlow</u> are extremely close to the facts of this case, but argued that the crucial distinction is that, unlike the defendant in <u>Wardlow</u>, he did not run away when he saw the officers and did not attempt to escape down an alley when observed by the police. Gordon proposes that under <u>Wardlow</u> flight may justify a <u>Terry</u> stop in these circumstances only when it is "headlong," presumably meaning that the defendant must run quickly away from the scene or aggressively attempt to elude the

13

approaching officers. We reject this reading of Wardlow. The Supreme Court did remark that "[h]eadlong flight -- wherever it occurs -- is the consummate act of evasion." 120 S. Ct. at 676. But the Court made clear that the key question in this context is whether the flight is unprovoked. Id. As quoted above, "[u]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business . . .." Id. (emphasis added). Here, there is no indication that Gordon's decision to move ten feet to the car, get inside, and drive away was provoked by anything other than the unexpected appearance of a marked police vehicle and direct eye contact with one of the officers. On this critical point the district court's factfinding is clear.

The Supreme Court in Wardlow plainly did not hold that evidence of the defendant's unprovoked flight may not be considered unless it is "headlong." Nor, in our view, would such a limitation be appropriate. We have said that whether reasonable suspicion exists must be determined on a case-by-case basis in view of the totality of the circumstances. See United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000). Obviously the speed of the suspect's movements may be relevant in the totality of the circumstances, but the fact that the suspect walked very

14

quickly, as opposed to ran, away from the spot where he was sighted by police does not itself change the analysis where it is evident from the circumstances that he was attempting to flee upon sighting the police. See Briggman, 931 F.2d at 709.[3]  Indeed, a defendant might well reason that the faster he attempts to disappear, the more likely it is that the police will suspect criminal activity is afoot, and conclude on that basis that he is actually less likely to be stopped if he merely moves quickly away from the scene rather than breaking into a sprint.  In this case, the district court's findings that Gordon ran or walked very quickly toward the adjacent car after making eye contact with the police, and then drove off in that car in the opposite direction from the police, establish Gordon's flight, and that fact coupled with the characteristics of the area adequately justified this stop.[4]

---

[3]Our holding today is consistent with our decision in Briggman, a pre-Wardlow case.  In Briggman, an officer conducting a routine patrol at night through a high crime area observed an occupied car with its parking lights illuminated parked inside the lot of several business establishments.  The officer cruised the lot twice; as he approached the second time, the defendant drove out of the lot, turned in front of the officer's vehicle, and onto a major road.  We ruled that there was reasonable, articulable suspicion sufficient to justify the ensuing Terry stop, even though there was no indication that the defendant sped away from the officer.  931 F.2d at 709 (noting that defendant "attempted to evade the officer").  We emphasized in that case, as we do again today, that it is not merely presence in a high crime area, but the affirmative and unequivocal attempt to flee upon sighting law enforcement, that may support a Terry stop.

[4]Gordon's citations to cases involving circumstances that he describes as "more suspicious than" this case are distinguishable.  Among other distinctions, none of those cases involved the defendant's flight upon making direct eye contact with a law enforcement officer -- the key fact in this case, especially in light of Wardlow.

On this record, we conclude that the police had reasonable, articulable suspicion for stopping Gordon, and thus affirm the district court's denial of that portion of Gordon's suppression motion.

B.

We have even less difficulty concluding that the police had probable cause to arrest Gordon under Florida's anti-loitering statute. The statute has two elements: (1) the accused must be loitering or prowling at a place, at a time, or in a manner not usual for law-abiding citizens; and (2) the loitering or prowling must be under circumstances that warrant a reasonable fear for the safety of persons or property in the vicinity. Fla. Stat. § 856.021(1). The statute lists several facts that may be considered in determining whether reasonable fear exists, including "the

Compare Brown v. Texas, 443 U.S. 47, 52, 99 S. Ct. 2637, 2641, 61 L. Ed. 2d 357 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct. . . . [A]ppellant's activity was no different from the activity of other pedestrians in that neighborhood."). In United States v. Davis, 941 F.2d 1465 (10th Cir. 1996), a pre-Wardlow decision, the defendant was stopped in a high crime area after he made eye contact with the officer, exited the car in which he was seated, and began walking toward an adjacent store. The Tenth Circuit found that the stop was unjustified, reasoning that the defendant's "actions in exiting the car, making and then breaking eye contact with the officers, and then walking away from the officers . . . do not furnish the basis for a valid Terry stop. Looking at a police officer and then looking away does not provide the officer with 'a particularized and objective basis for suspecting the person stopped of criminal activity,' . . .." Id. at 1468. In that case, however, there was no suggestion that the defendant was attempting to flee the police when he exited the car.

16

fact that the person takes flight upon appearance of a law enforcement officer." Id. § 856.021(2).

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Gonzales, 969 F.2d 999, 1002 (11th Cir. 1992). The undisputed facts establish probable cause to arrest Gordon. Detective Leon testified that Gordon and three other men were standing idle near a car parked in an area known for drug activity and shootings, at night, next to mostly abandoned buildings. This undisputed evidence satisfies the first prong of the statute. Although Gordon fairly observes that the buildings were not totally abandoned, and that a few law-abiding people may have had reason to be in the area, the totality of the circumstances establishes probable cause to believe that Gordon was "loitering or prowling at a place, at a time, or in a manner not usual for law-abiding citizens."

The second prong of the statute is also satisfied on this record. Flight is specifically identified as a fact tending to justify the requisite concern about the safety of persons and property in the area. Once the men were ordered out of the car pursuant to the lawful Terry stop, police observed in it several fully-loaded magazine clips readily accessible in the back seat. When asked to explain their

17

activities, the men gave conflicting and ambiguous answers. Against the backdrop of what the officers knew about the neighborhood in which the men were stopped, and particularly the notoriety of the area as a site of drive-by shootings, these facts justified a reasonable fear for the safety of persons or property in the vicinity.

Gordon cites a string of Florida cases where the courts found no probable cause to arrest under the Florida anti-loitering statute. All of these cases are distinguishable on their facts. In particular, here the presence of the ammunition in the car created a justifiable concern for the imminent safety of persons or property nearby. That evidence also distinguishes this case from Coleman v. State, 707 So. 2d 767 (Fla. Dist. Ct. App. 1998), the most apposite decision cited by Gordon. In Coleman, the defendant was observed by a police officer at night in a high crime area. The defendant began to walk away, and then began to run when the officer exited his unmarked car. The officer eventually tackled the defendant and found cocaine on him. A Florida appeals court reversed the trial court's denial of the defendant's motion to suppress, rejecting the state's argument that the officer reasonably believed the defendant had been loitering and prowling. The court explained that the officer's "suspicion that Coleman might have been participating in a drug transaction was not supported by articulable facts. Standing or walking in a high crime area does not, by itself, create a reasonable concern for the safety of

18

persons or property." Id. at 768. In this case, by contrast, the officer's reasonable concern was founded on more than Gordon's presence in a high crime area and his flight; it was founded on additional facts pointing to imminent unlawful activity, including the presence of the ammunition in the car.

Viewing the circumstances in their totality, there was probable cause to arrest Gordon for violating Florida's anti-loitering statute. As a result, the evidence seized from the car, and Gordon's post-arrest statements, were properly obtained, and Gordon's motion to suppress was properly denied.


IV.

In addition to the suppression issues, Gordon raises two related objections to his sentence. He contends that the district court improperly used unreliable hearsay statements by his co-Defendants to support a USSG § 3B1.1(c) role enhancement for being a leader of the robbery and an upward departure based on USSG §§ 5K2.3 and 5K2.8 due to the victim's psychological injury and the severity of his own conduct.[5] Gordon also contends that the district court failed to

_____

[5]USSG § 3B1.1(c) provides in pertinent part that a court should increase the offense level by two "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity . . .." USSG § 5K2.3 provides that "[i]f a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense, the court may increase the sentence above

19

make specific findings about the reliability of the co-Defendants' hearsay statements. Neither of these arguments (which are the only objections Gordon makes to his sentence) has merit.

The Sentencing Guidelines provide that a sentencing court may rely on "relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3; see United States v. Query, 928 F.2d 383, 384-85 (11th Cir. 1991) (court may consider reliable hearsay evidence at sentencing).

The district court, in sentencing Gordon, implicitly relied in part upon statements by Gordon's co-Defendants establishing Gordon's activities before and during the robbery. Among other things, Jackson, Grant, and Beauchamp stated plainly and consistently that it was Gordon who placed Maltbie in the chokehold and dragged her to the rear of the store, thereby uniformly contradicting Gordon's post-arrest claim that he entered the store only after the assault occurred. The co-

---

the authorized guideline range." USSG § 5K2.8 states that "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct." These two provisions set forth grounds upon which a court may, but not must, depart upward.

Defendants also stated that Gordon drove the car, gave orders inside the store, and otherwise acted as leader of the robbery.

The district court informed Gordon that Jackson and Beauchamp were prepared to testify at the sentencing hearing, but Gordon chose not to call them. Gordon instead challenged the § 3B1.1(c) enhancement proposed in the PSI by citing other post-arrest statements by his co-Defendants. The district court overruled Gordon's objections, finding that Gordon (1) initiated the robbery by driving the perpetrators to the store; (2) directed Jackson and Beauchamp while inside the store; and (3) attacked Maltbie, which allowed the co-Defendants to perpetrate the robbery. The district court specifically found that it was Gordon who "made the decision that Ms. Maltbie should be dragged across the store and thrown in the back of the store and left for dead." The district court also overruled Gordon's objections to an upward departure, finding that Gordon was primarily responsible for the assault, that his conduct terrorized Maltbie and caused her severe psychological harm, and that his conduct toward Maltbie was cruel, brutal and extreme.

Gordon now contends that the district court should not have relied on the statements of his co-Defendants. He contends in essence that those statements were unreliable because (1) they served to shift the blame from themselves and

onto Gordon; (2) Grant and Jackson claimed at one point that their statements were coerced; and (3) neither Jackson nor Beauchamp testified at trial or at sentencing.

These objections do not establish reversible error. Gordon had adequate opportunity to discredit Jackson and Beauchamp by calling them as witnesses at sentencing, but failed to do so. See Query, 928 F.2d at 385-86 (holding that district court's findings of fact regarding hearsay statements of non-testifying co-conspirator were not clearly erroneous, where the defendant had an opportunity to rebut the evidence against him at sentencing but failed to do so). Moreover, the hearsay statements at issue had sufficient indicia of reliability. Although Jackson, Grant, and Beauchamp -- all of whom had pled guilty by that point -- may have had an interest in shifting the primary blame to Gordon, each of the co-Defendants' statements was consistent regarding Gordon's role in the offense and his conduct toward Maltbie. This consistency lends the statements reliability. See, e.g., United States v. Connolly, 51 F.3d 1, 5 (1st Cir. 1995) (holding that district court properly credited at sentencing co-defendants' hearsay statements where those statements, while at odds with the defendant's version of events, were generally consistent with each other). Maltbie's trial testimony that the same man choked and assaulted her further corroborates the co-Defendants' statements that one man -- Gordon -- choked and assaulted Maltbie. Finally, Jackson withdrew his claim that his

22

statements were coerced, and even assuming that Grant's statement was coerced (an argument made in a motion to suppress which the district court denied) and should have been disregarded on that basis, Jackson and Beauchamp's statements were consistent regarding Gordon's egregious conduct. We conclude that the co-Defendants' hearsay statements had sufficient indicia of reliability to be considered by the district court in sentencing Gordon.

Gordon's related argument that the district court was required to make specific findings regarding the reliability of his co-Defendants' statements is also misplaced. Gordon relies solely on our decision in United States v. Lee, 68 F.3d 1267 (11th Cir. 1995). In Lee, the district court relied on the hearsay statement of the defendant's co-conspirator to establish the amount of drugs attributable to the defendant. We vacated the sentence and remanded for the district court to make specific factual findings regarding the amount of drugs properly attributable to the defendant, and as part of that process "to make further factual findings as to the reliability of [the co-conspirator's] hearsay statement." Id. at 1276. We observed that "[s]pecific findings on [the co-conspirator's] credibility are necessary before the district court can use this evidence as a basis for determining the base offense level in order to sentence" the defendant. Id.

In Lee, the crux of the problem was the apparent lack of sufficient indicia of reliability regarding the co-conspirator's statement; indeed, we specifically noted facts that powerfully undermined the reliability of the statement, including the co-conspirator's status as a fugitive from justice. Id. In those circumstances, the absence of findings was particularly glaring and troubling. Here, by contrast, there is materially consistent evidence from not one, but three, of Gordon's co-Defendants establishing Gordon's role in the offense and the brutality of his conduct. Those statements corroborate each other on the key points, and especially when considered alongside Maltbie's testimony and other record evidence, demonstrate adequate indicia of reliability. Accordingly, the district court's failure to make separate findings regarding the reliability of these statements was not error. While it may be advisable and in some instances necessary for a district court to make distinct findings regarding the reliability of hearsay statements used at sentencing, the absence of such findings does not necessarily require reversal or remand where the reliability of the statements is apparent from the record.

In short, the district court's treatment of the co-Defendants' hearsay statements did not constitute reversible error. Because the district court did not err in sentencing Gordon, and properly denied Gordon's motion to suppress, we affirm Gordon's conviction and sentence.

AFFIRMED.