**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 07-4187**

_____

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

    v.

LARRY LEE SCHAFFER,

          Defendant - Appellant.

_____

Appeal from the United States District Court for the Northern District of West Virginia, at Elkins.  Robert E. Maxwell, Senior District Judge.  (2:02-cr-00030-REM-1)

_____

Argued:  May 14, 2008          Decided:  July 3, 2008

_____

Before MICHAEL and DUNCAN, Circuit Judges, and Henry F. FLOYD, United States District Judge for the District of South Carolina, sitting by designation.

_____

Affirmed by unpublished opinion.  Judge Floyd wrote the opinion, in which Judge Michael and Judge Duncan concurred.

_____

**ARGUED:** Stephen Godfrey Jory, JORY & SMITH, Elkins, West Virginia, for Appellant.  Stephen Donald Warner, OFFICE OF THE UNITED STATES ATTORNEY, Elkins, West Virginia, for Appellee.  **ON BRIEF:** Sharon L. Potter, United States Attorney, Wheeling, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

FLOYD, District Judge:

Larry Lee Schaffer (Schaffer) was charged on December 17, 2002, with various drug and firearm violations. He subsequently filed a motion to suppress items seized during three warrantless searches of his residence. On March 1, 2004, the district court ruled that the first search of Schaffer's home was valid, but granted the motion to suppress as to the other searches.

Schaffer ultimately entered into a plea agreement with the Government, but he reserved the right to appeal the district court's March 1, 2004, decision. Schaffer, a felon, pled guilty to unlawful possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The district court sentenced Schaffer to a term of probation for a period of five years with the first six months to be served on home confinement. This appeal followed.

For the reasons explained below, we affirm the decision of the district court.

I.

The relevant facts, as set forth in the magistrate judge's Report and Recommendation, are as follows:

> At approximately 6:53 PM on May 29, 2002, David Carr, a Tucker County, West Virginia 911 communications center operator and dispatcher, received a telephone call from Nancy Schaffer. Nancy Schaffer stated that her husband had "threatened her with a gun earlier" and that she had run to a neighbor's (Mason) house located in Sponagle Bottom, Tucker County,

2

West Virginia.  Directions to the Mason residence were provided.  As a result of the 911 call, Carr notified West Virginia State Police Trooper Robert Hogan and Deputy Surguy of the nature and location of the call at 6:55 PM.

Hogan was working in the Canaan Valley Area when he received the dispatcher's call.  He knew the Schaffers because he had responded to a domestic dispute call at their residence within the preceding two years.  While en route to "Hambone" Mason's house, he requested that the dispatcher get more information.  At approximately 7:11 PM someone at the Mason residence advised Carr that Mr. Schaffer was last seen walking toward Parsons, West Virginia in a black T-shirt and jeans, without any weapon, which information Carr relayed to the police.

Upon Hogan's arrival, he observed Nancy Schaffer come out of the Mason house onto the porch.  She was hysterical and trembling.  Hogan noted that her eyes were glassy and that she smelled of alcohol.  Hogan did not recall whether she had slurred speech or whether he had asked her any questions about her having consumed any alcohol.  Hogan questioned her to find out if she knew where her husband was and whether he was armed or not.  Mrs. Schaffer told Hogan that her husband had held her at gunpoint with a Tech-9 firearm and had left the residence in a Brown Lincoln at approximately 5:00 PM.  She also told Hogan that she had been living at her son's house.  According to the written statement signed by Nancy Schaffer at approximately 7:31 PM, she stated: "He (Larry S[c]haffer) came up to where I was staying with my son, at the top of Fork Mountain, and said if you don't come down here, we are through.  I came down to Sponagle [B]ottom at the house."

. . .

Hogan observed that the Schaffer house, to which he had been within the last two years

3

in response to a domestic complaint, was located approximately 75 yards away from and within sight of the Mason house where he and Mrs. Schaffer were conversing. Considering this to be an unsafe situation, Hogan escorted Mrs. Schaffer to his police cruiser and proceeded to take her statement. Hogan considered Mrs. Schaffer to be "intoxicated." Hogan explained, however, that he considered anyone who had consumed any part of an alcoholic beverage to be "intoxicated," even if they [had only] one drink during dinner. He further explained that, while he considered Mrs. Schaffer to be intoxicated, he did not consider her to be impaired. He did not observe any slurred speech or unsteady motor skills. During the statement process, at approximately 7:31 PM, Mrs. Schaffer signed a consent to search form giving Hogan permission to enter and search the Schaffer residence. Hogan's reasoning for wanting to search the Schaffer residence was to determine whether Mr. Schaffer was hiding in the residence and whether there were weapons located within the residence which Schaffer could obtain.

Hogan, accompanied by Sgt. Stump, the detachment commander, and Mrs. Schaffer, entered the Schaffer yard through the gate in a chain link fence and went to the door of the house. Mrs. Schaffer secured several large dogs at the residence before the officers went in. Stump knew the Schaffers prior to May 29, 2002[,] as a result of having been to their residence one time before to answer a domestic disturbance call and as a result of his son and the Schaffer[s'] son being friends and having previously spent time together. As a result Stump knew that the Schaffers were husband and wife and [assumed that they] lived in the house the officers were about to enter. The officers made no inquiry of Mrs. Schaffer relative to facts which would justify her authority to consent to a warrantless search of the house. Hogan knocked on the door several times and received no answer. With guns drawn, the [o]fficers entered the residence. Although Hogan has no recollection

4

of who entered first or whether the door was locked or unlocked, be testified that he knew the officers "didn't knock the door down." According to the later testimonies of Leonard Nestor, Vickie Bodkins and Nancy Schaffer, however, entry into the Schaffer house was gained by breaking the door from its hinges. Hogan and Stump then conducted a protective sweep search of the rooms of the house seizing several guns which were inventoried and removed. The parties did not develop where within the Schaffer house the guns were found. Mrs. Schaffer tended to some dogs and parrots within the house. She said she wanted to make sure nothing happened to "her animals." She gathered and removed some personal clothing and effects. She removed some "women's trinkets" from the top of a dresser in the bedroom. Other than that, neither party developed where within the house Mrs. Schaffer gathered and removed personal clothing and effects and where the clothing and personal effects were located in relation to the guns seized. Sgt. Stump recalled Mrs. Schaffer requesting permission to take beer from the refrigerator but does not recall seeing her drink any beer. He also recalls telling her to slow up as they progressed through the house, in order to be sure it was safe. In addition to the guns, Sgt. Stump noticed photographs of Mr. and Mrs. Schaffer throughout the house.

During or shortly following the protective sweep search, word came through dispatch that the Brown Lincoln had been located.

(J.A. 194-98) (citations and footnotes omitted).

The magistrate judge suggested that Schaffer's motion to suppress be denied on the basis of Nancy Schaffer's consent to search Schaffer's house. The district court, however, disagreed that Nancy Schaffer had any authority to consent to the search.

5

Nevertheless, the district court denied the motion to suppress as to the first search of Schaffer's home on the basis of exigent circumstances, but granted the motion as to the other searches.

## II.

Schaffer contends that the district court made erroneous findings of fact in determining that the first warrantless entry into his residence was justified by exigent circumstances. We review findings of fact made by a district court ruling on a motion to suppress for clear error but review the ultimate suppression decision de novo. United States v. Rusher, 966 F.2d 868, 873 (4th Cir. 1992). We decide not whether we would have made the finding the district court did, but whether "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." United States v. Gypsum Co., 333 U.S. 364, 395 (1948). When a suppression motion has been denied, we review the evidence in the light most favorable to the Government. United States v. Grossman, 400 F.3d 212, 216 (4th Cir. 2005).

The Fourth Amendment upholds "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Therefore, "[a]bsent exigent circumstances, [the] threshold [of one's house] may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980). It follows then,

6

that warrantless entries into a residence are presumptively unreasonable. United States v. Turner, 650 F.2d 526, 528 (4th Cir. 1981) (citing Payton v. New York, 445 U.S. 573, 586 (1980)).

Nevertheless, a warrantless search may be conducted when the "exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 394 (1978) (citation and quotation marks omitted). "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Id. at 392 (citation and quotation marks omitted).

"The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." Warden v. Hayden, 387 U.S. 294, 298-99 (1967). A warrantless search, however, must be "strictly circumscribed" by the exigency that justifies the exception to the warrant requirement. Mincey, 437 U.S. at 393.

To successfully sustain the exigent circumstances doctrine, police officers need possess only a "reasonable suspicion" that such circumstances exist at the time of the search or seizure in question. United States v. Grogins, 163 F.3d 795, 797 (4th Cir. 1998). "[A] plausible claim of specially pressing or urgent law enforcement need" can justify a warrantless search or seizure. Illinois v. McArthur, 531 U.S. 326, 331 (2001). It is not the

7

province of this Court to engage in "unrealistic second-guessing" of the officers' assessment of the circumstances that they faced. United States v. Montoya de Hernandez, 473 U.S. 531, 542 (1985).

This Court has set forth five factors that district courts are to consider when deciding whether an exigency existed at the time a search commenced:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that police are on their trail; and (5) the ready destructibility of the contraband.

United States v. Mowatt, 513 F.3d 395, 399 (2008) (citation omitted). We have previously held that "arguably, these factors must be supplemented by the gravity of the underlying offense, a factor employed by the Supreme Court in the context of a warrantless arrest." United States v. Owens, 848 F.2d 462, 470 n.4 (4th Cir. 1988).

It bears noting here that this list is inexhaustive and no single factor is controlling. See United States v. Reed, 935 F.2d 641, 642 (4th Cir. 1991). ("[T]here is no precise formula since emergency circumstances will vary from case to case and the inherent necessities of each situation must be scrutinized.") Instead, exigencies must be judged in light of all of the relevant

8

factors and from the totality of the circumstances known to the officer at the time of the warrantless intrusion.

## III.

The district court made the following findings of fact:

> In the case at bar, the officers had information that [Mr. Schaffer] had threatened the victim with a gun, had abandoned his car near his residence, and had last been seen walking toward Parsons, but within close proximity to his residence. The officers did not know for certain where [Mr. Schaffer] was, but the Court finds that, based on these facts, the officers were objectively reasonable in their rational inference that [Mr. Schaffer] may have been in his house. Further, based on the facts, there can be no question that the officers were reasonable in rationally inferring that [Mr. Schaffer] posed a danger. The Court finds that it was critical, given what the officers knew at the time, for them to secure the premises and ensure their own safety as well as the safety of Mrs. Schaffer, an individual in their protection. Therefore, the Court finds, upon consideration of the exigencies of the situation, that the needs of law enforcement were so compelling, in that there was a need to protect or preserve life or prevent serious injury, that the first warrantless entry and protective sweep was objectively reasonable under the Fourth Amendment and thus lawful.

(J.A. 249.)

Schaffer specifically objects to the district court's finding that "the officers had information that [Schaffer] . . . 'had abandoned his car near the residence[,]' and 'had last been seen walking toward Parsons, but within close proximity to his

9

residence.'" (Appellant's Br. 7) (citing J.A. 249). Inexplicably, the Government counters Schaffer's argument with nothing more than a statement that "[t]he United States takes the position that these findings are well supported by the testimony presented at the two days of suppression hearings. The District Court was not clearly erroneous in making these findings." (Appellee's Br. 10) (citations omitted). Therefore, inasmuch as the Government's brief is bereft of citations to the record supporting its position, we have carefully combed the record ourselves to determine whether the district court's decision to deny the motion is supported by the record. In our review, "[w]e are not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record." United States v. Smith, 395 F.3d 516, 519 (4th Cir. 2005) (citation omitted).

There is no dispute that the officers had information that Mr. Schaffer had threatened the victim with a gun. (Appellant's Br. 2) ("[O]n May 29, 2002, Mrs. Schaffer called the 911 center at 6:53 p.m. to report that her husband had held a gun to her head and threatened to kill her." (citing J.A. 36, 37)). In addition, the record supports the district court's determination that

> [t]he officers did not know for certain where [Mr. Schaffer] was, . . . the officers were objectively reasonable in their rational inference that [Mr. Schaffer] may have been in his house. . . . the officers were reasonable in rationally inferring that [Mr. Schaffer] posed a danger. . . . [and the officers were reasonable in their decision to] secure the

10

premises and ensure their own safety as well as the safety of Ms. Schaffer, an individual in their protection.

(J.A. 249.)

For instance, regarding Schaffer's location, Hogan attested:

We weren't aware of Mr. Schaffer's whereabouts, and he did have a weapon. He may have been -- she couldn't tell us whether, yes or no, he was in the house, so that's why we went in with guns drawn and secured the house, to make sure Mr. Schaffer wasn't in there with a weapon.

(J.A. 67.) Moreover, when Stump was asked if he had "any reason to believe [Schaffer] could have been in the house[,]" Stump responded, "I was unsure where he was, we were both unsure where he was at the time." (J.A. 117.)

On the issue of safety, Stump testified to the following:

Q: You were concerned for your safety?
A: Yes.
                . . .

Q: So the three of you go into the house, and what happened -- were your guns drawn?
A: Yes.
Q: Why were your guns drawn?
A: The report and through the statement, apparently, Mr. Schaffer had held her at gunpoint inside the residence. We didn't know if he was still in there. It was kind of a scary situation at that point, sir.

(J.A. 117, 120-21.)

On the related question as to who entered the residence first, the magistrate judge stated in the "Recommended Findings of Fact"

11

section of the Report and Recommendation, which we adopted, that "Mrs. Schaffer secured several large dogs at the residence <u>before the officers went in.</u>" (J.A. 197) (emphasis added). We note that this refers to the officers entering the yard, not the house.

When queried about this issue at the suppression hearing, Stump attested as follows:

> Q: Who was with you when you first went through the door?
> A: Mrs. Schaffer -- or Trooper Hogan and Mrs. Schaffer.
> Q: So the three of you go through?
> A: Yes. <u>She was behind us two</u>.
> Q: Why was Mrs. Schaffer with you?
> A: Basically, they had several dogs there, rather large dogs. She took care of them, made sure that they didn't cause us any harm as we went in the -- in the home.
>
> . . .
>
> Q: Okay. Who went into the residence first?
> A: I don't recall who went first. It was kind of both of us went very close together. I'm not sure -- it was either me or Hogan, Trooper Hogan.
> Q: And the dogs were in the yard or in the house?
>
> . . .
>
> A: I believe there might have been a couple dogs in the yard and a dog in the house at that point, as far as I can recall. I'm not totally clear, sir.

(J.A. 119, 127-128) (emphasis added).

On this issue, Hogan similarly testified:

> Q: [Mrs. Schaffer] secured the dogs?

12

> A.   -- pretty big dogs, they're -- Mr.
>       Schaffer may know the types of dogs, I'm
>       not sure of the name of the dogs.
> Q:   So she went in the house with you?
> A:   Yes, sir. <u>Behind us</u>, but, yes, she did
>       enter the house with us.

(J.A. 67) (emphasis added).

Still, Schaffer argues that

> the officers did not enter Mr. Schaffer's
> residence with any belief that an armed and
> dangerous person was hiding therein.  If they
> truly believed that to be the situation, the
> officers would not have knowingly exposed
> Nancy Schaffer to danger, and would certainly
> have not permitted her to walk freely from
> room-to-room within the house.

(Appellant's Br. 9.)

Although the record does establish that Nancy Schaffer went into the residence with the officers, it is nothing more than conjecture to state that she walked freely inside the house before it had been secured.  In fact, according to Hogan, "she was going around just -- she was, basically, with Sergeant Stump, behind Sergeant Stump, going around, picking through things, looking at things."  (J.A. 68.)  Moreover, although "she started collecting clothing before [the officers] even cleared the whole house," (J.A. 122), Stump testified that she was not ahead of the officers when collecting her items.  (J.A. 129.)

> Q:   Okay, and Mrs. Schaffer -- Mrs. Schaffer
>       goes in with you, and, as you indicated,
>       as you're searching the house and
>       concerned about everybody's safety, Mrs.
>       Schaffer is ahead of you or in different

13

> rooms collecting some of her items, is that correct?
>
> A: Not ahead of us. I did my best to keep her behind us, because we didn't need her in the house at that time, we didn't want her in the house at that time, she wanted to be there; plus, if we left her out in the car, did we know that Mr. Schaffer wouldn't return and do harm to her out in the yard? It was a totally unsafe situation, in my opinion.

(J.A. 129.)

Hogan's testimony corroborated this testimony of Stump:

> Q: So she went in the house with you?
> A: Yes, sir. Behind us, but, yes, she did enter the house with us.
> Q: You, Sergeant Stump, and Nancy Schaffer, then, entered the residence, correct?
> A: Yes, sir.
> Q: And, when you got inside, what did you do as soon as you entered the front door? Were your weapons pulled?
> A: We had our weapons drawn.
> Q: Why?
> A: We also had our flashlights.
> Q: Why?
> A: For the simple fact -- I'm going back to it again, but officer safety.

(J.A. 67.)

Certainly, Nancy Schaffer's evident lack of fear for her safety in no way diminishes the officer's testimony that they thought the circumstances to be unsafe. Simply stated, the officers had limited options and even more limited time to consider them.

Turning to the factors enumerated in <u>Mowatt</u>, inasmuch as it was reasonable for the officers to believe that an armed man was

14

lurking around and may have already returned to his home, the first factor, the urgency factor, favors the Government's argument concerning exigent circumstances. The second factor, concerning the officers' reasonable belief that the contraband was about to be removed or destroyed, favors the Government to the extent that this factor is construed to refer to the officers' reasonable belief that Schaffer might be in the house and he might flee. The third factor regarding the possibility of danger to police guarding the site also favors the Government. It was reasonable for them to enter the house based on the circumstances that they faced to determine if Schaffer was present and armed. Further, the fact that they entered the house with their guns drawn demonstrates their concern for not only their safety but also for Nancy Schaffer.

As to the fourth factor, there is no evidence in the record as to whether Mr. Schaffer was aware that the police were on his trail. There is also no evidence in the record as to the fifth factor, that the officers were concerned about the ready destructibility of the contraband. Thus, these two factors favor neither party. Concerning the gravity of the offense, here, the officers were confronted with a situation in which it is unchallenged that the officers had information that Mrs. Schaffer had reported that Mr. Schaffer "had held a gun to her head and

threatened to kill her." (Appellant's Br. 2) (J.A. 36, 37). Thus, this factor favors the Government.

In sum, viewing the situation from the perspective of the officers at the scene of the first warrantless search of Schaffer's house, we are of the firm belief that the circumstances that the officers faced here would cause a reasonable person to believe that entry into Schaffer's home was necessary to preserve life or avoid serious injury to the officers and to Mrs. Schaffer and to prevent the possible escape of Mr. Schaffer. Accordingly, the officers' first warrantless entry into Mr. Schaffer's house was appropriate.

IV.

Inasmuch as "we may affirm on any grounds apparent from the record[,]" Smith, 395 F.3d at 519, we have made a de novo review of the district court's ultimate suppression decision as to the first warrantless entry. Consequently, we hold that the record, when considered in its entirety, supports the district court's denial of the motion as to that issue. Therefore, we conclude that the district court did not err in denying Schaffer's motion to suppress as to the initial search of his residence. Accordingly, the decision of the district court is

AFFIRMED.

16