[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15802
Non-Argument Calendar

_____

D.C. Docket No. 1:14-cr-20208-DPG-1

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

FESTUS OKEY OLUIGBO-BERNARDS,

Defendant–Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 14, 2016)

Before MARTIN, JULIE CARNES, and ANDERSON, Circuit Judges.

PER CURIAM:

A jury convicted Defendant Festus Oluigbo-Bernards of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and importation of a controlled substance, in violation of 21 U.S.C. § 952(a).  The district court sentenced him to 60 months' imprisonment.  On appeal, Defendant challenges the district court's denial of his motion to suppress evidence found during a border search.  He also argues that his sentence was procedurally and substantively unreasonable.  After careful review, we affirm.

## I.    Background[1]

On March 18, 2014, Defendant flew from Curaçao, Netherlands Antilles, to Miami, Florida.  When the plane arrived at Miami International Airport, U.S. Customs and Border Protection ("Customs") agents checked the passports and customs declaration forms of all passengers as they disembarked at the gate.  The agents checked to make sure the passengers' documentation was in order and asked three to five questions of each passenger, looking for any inconsistencies or suspicious behavior.

The Customs agents were specifically interested in Defendant, as they had received a "look-out" alert from their supervisor based on information from German customs officials that Defendant was involved in narcotics smuggling.

---

[1]  The following facts are taken from the testimony at the suppression hearing, viewed in the light most favorable to the Government.  *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008).

2

Before Defendant's flight landed, Customs agents researched Defendant's travel itineraries and discovered that he had multiple flight reservations for that same day: one from Miami to Toronto via New York, and another from New York to Lagos, Nigeria, via London and Amsterdam. In reviewing Defendants' travel history, the agents found a photo of Defendant and saw that he was a frequent traveler.

As the passengers made their way through the three inspection lines, Agent David Simko encountered Defendant. Agent Simko greeted Defendant, "Good morning," to which Defendant replied, "Business." Defendant presented a Dutch passport, and Agent Simko observed several signs that Defendant was nervous: he was sweating a little, he avoided eye contact, and his carotid artery was pulsating in the base of his neck. Agent Simko directed Defendant to passport control, where he was diverted to the secondary inspection area. Agents searched his carry-on luggage and conducted a pat-down search, but they found no contraband. Agents, however, did find five cellular phones, thirteen SIM cards, and five currencies. Throughout the inspection process, the agents observed that Defendant had white, pasty lips, he was pacing back and forth, he avoided eye contact, and his carotid artery continued to throb.

During Defendant's secondary interview with Agent Christian Veloz, Defendant said he was traveling to the United States to purchase hair-weave

3

products for his business in Curaçao.  When asked which cities he was traveling to,

he explained that he was going to travel to New York for four days to purchase the

merchandise, and then he was going to take a bus to Canada to visit a cousin

named Tony.  This information struck Agent Veloz as inconsistent with

Defendant's airline reservations.  Defendant said he was going to stay at a hotel in

Queens, New York, but he did not have a reservation because he usually checked

into hotels without booking in advance.  Agent Veloz asked if Defendant was

going to stay with his cousin Tony in Canada, but Defendant then said he was

going to Canada to visit his girlfriend.  Defendant said his girlfriend knew he was

coming, but she did not know which day he would arrive.  According to

Defendant, he had never been to Canada before.

When Agent Veloz asked Defendant a question, Defendant would repeat the

question back to him.  For example, when asked, "What's the purpose of your

trip," Defendant responded, "What's the purpose of my trip?"  Agent Veloz

believed this was a stalling tactic and a sign of nervous behavior.  It was also odd

because Defendant was a frequent business traveler and, based on their research,

the agents knew that Defendant had been through the inspection process many

times.  Typically, frequent travelers are familiar and comfortable with the

inspection process and know what to expect.

4

Based on Agent Veloz's behavior-analysis training, the agent believed Defendant exhibited verbal and nonverbal signs suggesting that he was a narcotics smuggler. The agents told Defendant they suspected him of being an "internal carrier," meaning he was smuggling drugs inside his body. Defendant denied that he was carrying drugs and said he did not want to speak to the agents anymore. The agents explained to Defendant that he could be taken to the hospital to be x-rayed, and they presented him with an x-ray consent form. They told him the x-ray was voluntary, but if he did not consent to an x-ray, they would seek approval from their supervisor to conduct a monitored bowel movement. Defendant read the form, confirmed he understood it, and signed it.

The agents next read Defendant his *Miranda*[2] rights. The agents presented Defendant a *Miranda* form, and Defendant read and initialed each line as the agents explained it to him. Defendant then invoked his *Miranda* rights. The agents filled out paperwork associated with their investigation and awaited approval to conduct the x-ray, which took about two hours. At some point, Defendant asked for his cell phone so he could listen to music. He was told he was not allowed to use electronic devices, but he became adamant that he was going to use his cell phone. As his body language became more threatening, Agent Veloz took out his baton and held it down behind his right leg. Agents warned Defendant

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

that he needed to calm down, and then he was placed in a holding cell until he could be taken to the hospital.

Defendant was eventually transported to Jackson Memorial Hospital, where an x-ray revealed foreign objects in his alimentary canal.  He eventually passed 27 condoms filled with a total of 1.33 kilograms of cocaine.  Defendant was charged with possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and importation of a controlled substance, in violation of 21 U.S.C. § 952(a).

Before trial, Defendant moved to suppress the cocaine evidence because he argued that his consent to be x-rayed was not voluntary.  He further argued that the Customs agents lacked reasonable suspicion of drug activity to justify taking an x-ray absent his consent.  The district court denied the motion, finding that the agents had a reasonable articulable suspicion that Defendant was smuggling narcotics internally and that, in any event, Defendant had voluntarily consented to the x-ray. Defendant proceeded to trial, a jury convicted him of both counts, and the court sentenced him to 60 months' imprisonment, which was within the Guidelines range of 51 to 63 months.

## II.    Discussion

### A.    Motion to Suppress

We review the denial of a defendant's motion to suppress under a mixed standard of review, reviewing findings of fact under the clearly erroneous standard and reviewing *de novo* the application of law to those facts.  *United States v. Gil*, 204 F.3d 1347, 1350 (11th Cir. 2000).  Because the Government prevailed below, we construe the facts in its favor.  *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008).  We allot substantial deference to the district court in making credibility determinations with respect to witness testimony.  *United States v. McPhee*, 336 F.3d 1269, 1275 (11th Cir. 2003).

Persons crossing the border into the United States have a greatly reduced expectation of privacy.  *United States v. Montoya de Hernandez*, 473 U.S. 531, 539 (1985).  Routine border searches are "not subject to any requirement of reasonable suspicion, probable cause, or warrant."  *Id.* at 538.  Moreover, a secondary customs search following the initial inspection is proper even absent reasonable suspicion of criminal activity.  *United States v. Santiago*, 837 F.2d 1545, 1548 (11th Cir. 1988).

A more intrusive, non-routine border search, however, requires that a customs agent have reasonable suspicion.  *United States v. De Montoya*, 729 F.2d 1369, 1371 (11th Cir. 1984); *see also United States v. Pino*, 729 F.2d 1357, 1359

7

(11th Cir. 1984) (finding that use of an x-ray was constitutional when customs agents had reasonable suspicion that a traveler was smuggling drugs internally). "To determine whether reasonable suspicion exists, the court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Tinoco*, 304 F.3d 1088, 1116 (11th Cir. 2002) (internal quotation marks omitted).

Defendant argues that the district court's fact-finding was erroneous because Defendant's behavior provided no cause for suspicion and the district court failed to consider any alternative rational explanations for Defendant's conduct and answers. Defendant cites *Brent v. Ashley*, 247 F.3d 1294, 1300–01 (11th Cir. 2001), where we held that a strip search and x-ray examination by customs officials were unconstitutional when the searches were based on nothing more than the traveler's nervousness and her arrival from a drug source country. But here we have much more. In addition to receiving a look-out alert that Defendant was suspected of being involved in narcotics smuggling, Customs agents observed signs of nervousness, including sweating, pacing back and forth, and a throbbing carotid artery. Before the Customs agents diverted Defendant to secondary inspection, he responded, "Business," when an agent said, "Good morning." All of this behavior was suspicious considering Defendant was a frequent business

8

traveler and had been through the inspection process several times.  Defendant also provided inconsistent stories about his trip to Canada and had two flight reservations for that same day to Toronto and Lagos, neither of which matched Defendant's stated plans to go to New York for several days before taking a bus to Canada.  While there were no drugs in Defendant's luggage or on his person, he had five cell phones, thirteen SIM cards, and five currencies, which struck the customs agents as unusual even for a business traveler.  And after being told he was suspected of smuggling drugs, Defendant was so insistent that he wanted to use his cell phone that the agents warned him to calm down and placed him in a holding cell.

These facts, coupled with an absence of contraband in Defendant's luggage, created a reasonable suspicion that Defendant was an internal carrier.  *See Denson v. United States*, 574 F.3d 1318, 1343 (11th Cir. 2009) (explaining that a failure to find drugs externally could raise a reasonable suspicion that a traveler is carrying drugs internally if other facts and circumstances would lead a customs agent to reasonably suspect a traveler is carrying drugs); *United States v. Vega-Barvo*, 729 F.2d 1341, 1350 (11th Cir. 1984) (finding reasonable suspicion to conduct an x-ray after a strip search revealed no drugs when passenger was traveling alone from a source country, carried only one piece of poor-quality luggage, and told an implausible story about her business trip to the United States).  Moreover, we

disagree that the existence of possible innocent explanations for Defendant's conduct thereby neutralized the agents' rational concerns.  Based on the totality of the circumstances here, the Customs agents had reasonable suspicion "even if each fact, viewed in isolation, [could have been] given an innocent explanation." *Tinoco*, 304 F.3d at 1116.[3]

Defendant next contends that his consent to the x-ray was not voluntary because at that point he had already stated that he wanted to stop speaking to the agents.  Once the Customs agents had reasonable suspicion that Defendant was smuggling drugs internally, however, Defendant's consent to the x-ray was unnecessary.  *United States v. Saldarriaga-Marin*, 734 F.2d 1425, 1427–28 (11th Cir. 1984) (holding that "once reasonable suspicion has been established, Customs agents can transport the suspected carrier to a hospital for an x-ray exam that is not physically forced, regardless of whether the carrier has 'freely and voluntarily' consented to the exam"); *Vega-Barvo*, 729 F.2d at 1350 (same).  What is more, the agents' reasonable suspicion permitted them to detain Defendant for the time

---

[3]  Defendant faults the district court for crediting Agent Veloz's testimony at the suppression hearing.  In particular, Defendant points to Agent Veloz's statement in his written report that Defendant was randomly searched, even though the agents had received the look-out alert and planned to question him all along.  The agent testified that he was trained to call such searches "random" in written reports to safeguard confidential law enforcement information.  Defendant thus argues that the district court should not have accepted the agent's testimony and should have provided a reason for why it found him credible despite the misrepresentation in the report.  After reviewing Agent Veloz's testimony, and keeping in mind the substantial deference we give to factfinders in making credibility determinations, *McPhee*, 336 F.3d at 1275, we do not find the testimony to be so inconsistent as to be totally unbelievable.  Consequently, the district court did not clearly err in crediting Agent Veloz.

10

necessary to conduct an x-ray examination. *United States v. Mosquera-Ramirez*, 729 F.2d 1352, 1356 (11th Cir. 1984). Accordingly, the district court properly denied the motion to suppress.

B.    Sentence

The district court must impose a sentence that is procedurally and substantively reasonable. *Gall v. United States*, 552 U.S. 38, 51 (2007). This Court first ensures that the district court did not commit a significant procedural error, such as improperly calculating the Sentencing Guidelines range or failing to consider the factors under 18 U.S.C. § 3553(a).[4] *Id.* If we find no procedural error, we proceed to review the substantive reasonableness of the sentence for abuse of discretion. *Id.* Under that standard, "[w]e may set aside a sentence only if we determine, after giving a full measure of deference to the sentencing judge, that the sentence imposed truly is unreasonable." *United States v. Irey*, 612 F.3d 1160, 1191 (11th Cir. 2010) (en banc). But here, Defendant failed to object to the sentence after it was imposed. Therefore, we review only for plain error. *United States v. Mahique*, 150 F.3d 1330, 1332 (11th Cir. 1998).

First, Defendant argues that his sentence is procedurally unreasonable because the district court failed to consider all the § 3553(a) factors. The court

---

[4] These factors include, among others, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, and the need to deter criminal conduct. 18 U.S.C. § 3553(a).

11

need not discuss each factor explicitly, and "[a]n acknowledgement the district court has considered the defendant's arguments and the § 3553(a) factors will suffice." *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008). Furthermore, "when sentencing within the advisory Guidelines range, the district court is not required to give a lengthy explanation for its sentence" in the typical case. *United States v. Livesay*, 525 F.3d 1081, 1090 (11th Cir. 2008). Here, the court properly acknowledged that it had considered the parties' arguments, along with the § 3553(a) factors, before imposing the sentence. We find no procedural error.

As for the substantive reasonableness of the sentence, Defendant argues that many of the § 3553(a) factors weighed in favor of a sentence at the low end of the Guidelines range of 51 to 63 months. Defendant emphasizes that he had no criminal history, never spent time in prison before his arrest, and was a businessman who supported his family. The weight given to any particular factor is left to the district court's sound discretion. *United States v. Amedeo*, 487 F.3d 823, 832 (11th Cir. 2007). We reverse only "if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008) (quotation marks omitted). And while we do

12

not presume that a within-Guidelines sentence is reasonable, we typically expect such a sentence to be reasonable. *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008). As the Government argues, the factors do not weigh clearly in favor of Defendant. Defendant committed a serious offense and he refused to accept responsibility for his conduct. And unlike some cases where defendants may have smuggled drugs because of coercion or poverty, by all accounts Defendant was a reasonably successful businessman and frequent traveler. Therefore, we identify no plain error and further find that Defendant's 60-month sentence was substantively reasonable.

## III.   Conclusion

For the foregoing reasons, we affirm Defendant's conviction and sentence.

**AFFIRMED.**